———o———

ELLSWORTH and Others *v.* POMEROY and Others.

PARTNERSHIP.—AGENCY.—A being the owner of a number of land warrants, agreed with B that the latter should locate the warrants, and take the agency of the lands as A's attorney, and sell and dispose of the same, paying all necessary expenses of surveying and recording deeds. The title was to remain in A until the lands should be sold, and the first proceeds of sale were to be applied to re-imburse to A the cost of the land, with ten per cent. interest; afterwards B was to be re-imbursed for expenses paid by him, and the residue of the proceeds were then to be equally divided between A and B. It was further agreed that B was to be the sole agent for selling said lands; that they should all be sold within four years, and if any remained unsold at the expiration of that time that B should make no claim to any interest in such lands. B further agreed to guarantee to A the return of his capital with interest. By a subsequent contract between the same parties, in reference to other lands, it was agreed that B should "take the agency" of the latter lands upon the terms mentioned in the former contract. A died before the expiration of the four years, and before all of the lands had been sold.

*Held,* that the contract did not create a partnership, nor did it invest B with any equitable interest in the land.

*Held,* also, that the relation of the parties was that of principal and agent.

APPEAL from the *Tippecanoe* Circuit Court.

FRAZER, J.—This was a suit commenced in 1862, by the personal representatives and heirs at law of *Henry L. Ellsworth*, deceased, against the personal representatives

of *Benjamin Pomeroy,* deceased, all of whom were non-residents. It appears by the complaint that *Ellsworth* and *Pomeroy* had entered into the following written contracts, at the times they respectively bear date:

"I, *Henry L. Ellsworth,* of *Lafayette, Tippecanoe* county, *Indiana,* hereby make known, that whereas *Benjamin Pomeroy,* of *Stonington,* in *New London* county, and State of *Connecticut,* has procured and delivered to me, said *Henry,* nine land warrants, for one hundred and sixty acres of land each, and three land warrants for eighty acres each, and twelve land warrants for forty acres each, with a power, or letter of attorney attached to or accompanying each warrant, or certificate, by the owners thereof respectively, authorizing and empowering me to locate the same; and whereas said *Pomeroy* has agreed to procure a deed from each of said owners, (so far as it can be done without too great expense,) conveying to himself the land to be located by virtue of said warrants or certificates, and said power of attorney, as soon after the respective patents are issued as may be; now in consideration of the foregoing, and of the further agreements and stipulations hereinafter mentioned, on said *Pomeroy's* part to be performed, I, said *Henry,* agree to locate said warrants, or certificates, immediately, according to my best judgment and skill, to receive said deeds conveying said lands to said *Pomeroy* and cause the same to be recorded, to take the care and agency of said lands so conveyed to said *Pomeroy,* as his attorney, to sell and dispose of said lands, and to make no charge as agent for commissions for locating, care, diligence, skill, or any personal services; but to charge for money paid out for recording deeds, taxes, if any, paid on said lands, and surveying, if any is needed; said *Pomeroy* having agreed to be at the whole expense of purchase of said lands, of the patents, and of procuring deeds of the same; the title to remain in him until *bona fide* sold, and the first proceeds of said lands, or any portion thereof, to be paid over to said *Pomeroy* until he is reimbursed his capital invested in the purchase of said lands, which is to be

reckoned at $115 dollars for a full warrant of 160 acres, or seventy-one 87-100. cts. per acre, with interest thereon at the rate of ten per cent. per annum, and to pay to me such sums of money as I shall have paid for recording deeds, taxes and surveying, and the balance or remainder of the proceeds of the sale of said lands, is to be divided equally between said ·*Pomeroy* and myself. I to be the sole agent for selling for the term of four years, during which period of four years all of said lands are to be sold, unless longer time is mutually agreed upon by said *Pomeroy* and myself. No money to be expended on said lands unless mutually agreed upon as aforesaid. Now, in consideration of my right to one-half said balance or remainder, and .the foregoing, I, said *Henry*, guarantee to said *Pomeroy*, his heirs and assigns, and bind myself, heirs, &c., that said *Pomeroy* shall receive his. capital in said lands invested. as aforesaid, and ten per cent. thereon within four years from this date; and in case any of said lands remain unsold at the end of four years from this date, I, said *Henry*, will make no claim to any interest in such unsold lands thereafter, but that the same shall be wholly vested in said *Pomeroy*, his heirs and assigns, &c. The within and foregoing, on these pages, is a true copy of our agreement. In testimony whereof we have hereunto set our hands and seals this 10th day of *January*, 1852. The original, executed by *Henry L. Ellsworth*, is in the hands of *Benjamin Pomeroy.*       (Signed)

"B. POMEROY,           [L. S.]
"HENRY L. ELLSWORTH. [L. S.]"

"A memorandum of agreement between *Benjamin Pomeroy*, of *Stonington*, *Connecticut*, and *Henry L. Ellsworth*, of *Lafayette*, *Indiana*, that whereas said *Pomeroy* owns certain lands in *Benton* county, *Indiana*, concerning the agency, sale and division of profits of which, after deducting ten per cent. per annum on the agreed cost to said *Pomeroy* of said lands, to be said *Pomeroy's* wholly, we have a contract bearing date 10th *January*, 1852; and whereas said *Pomeroy* owns 800

acres of land in *White* county, *Indiana*, which it is agreed cost said *Pomeroy*, $1,000, on the 10th day of *January*, 1852, now it is agreed that said *Ellsworth* take the agency of said lands in said *White* county, in all respects upon the same terms he has those in *Benton* county; the agency to commence and end at the same time as for said lands in *Benton* county, the only variation being in the cost of said lands in said *White* county, which cost one and 25-100 dollars per acre, and those in *Benton* county cost only seventy-one and 87-100 cents per acre; per centage on costs per annum of profit or interest, and guarantee the same as on said contract, reference thereto being had now in each of our hands. *March* 16th, 1854.

(Signed)          "B. POMEROY,
                    "H. L. ELLSWORTH."

It also appears that *Ellsworth* located the land warrants mentioned in the first contract, and that titles were duly perfected in *Pomeroy*, as grantee of the warrantees.

It also appears by the complaint, that on the 20th day of *September*, 1855, *Pomeroy* died testate, and that his will was, on the 24th of *September*, 1855, probated in *Connecticut*, but that it had not been probated or recorded in this State; that *Ellsworth* died in 1857; that at the death of *Pomeroy*, the four years within which the said lands were to have been sold had not expired, and that in consequence of his death no sales could be made, *Ellsworth* having no power except that conferred by the agreements; that prior to and at the time of the death of *Pomeroy*, negotiations were pending for an extension of time, and that on the 5th of *January*, 1856, the defendant, *Isaac Pomeroy*, one of the executors and trustees under the will of said testator, agreed with *Ellsworth* to extend the time of selling beyond said four years. By *Pomeroy's* will, a copy of which is set out in the complaint, the lands in *Indiana* were devised to two of his sons, *Benjamin Pomeroy, jr.*, and *Isaac Pomeroy*, in trust to sell and dispose of the same in their discretion, and to pay legacies, &c., but they had no express power to make any agreement to extend the contract with said decedent, *Ellsworth*, which the

complaint avers *Isaac* did.   It was further averred that the lands were of the value of $30,000, and that *Ellsworth* had expended a small sum of money in recording deeds, &c. The object of the suit was to settle and adjust the rights of the parties in the lands or their proceeds.

The defendants demurred to the complaint by *Ellsworth's* administrator, and, by a separate demurrer, to the complaint by the heirs at law, alleging for cause the want of sufficient facts to entitle them to any relief.

It is conceded that if *Ellsworth* had no equitable interest in the lands, or in the fund to arise from the sale of them, but only a claim against *Pomeroy*, in person, for services and expenditures as agent of the latter, then this suit will not lie.

The only question presented for consideration, is whether *Ellsworth* had, in equity, any interest in the land.   Did the contracts constitute a partnership between the parties to it, with a joint interest in the property itself, or did they create merely the relation of principal and agent?

After much consideration we have reached the conclusion that the relation of the parties was that of principal and agent.   That the agent was to be liable for all losses, to guarantee a certain profit to *Pomeroy*, and was to be compensated by a certain share of the remaining profits which should be realized by actual sales of the lands, which might be made within a limited time, and that after the expiration of that time the agency should cease.   A breach of the contract by *Pomeroy*, in preventing the agent from executing it, and thereby reaping its advantages, would be properly compensated only in damages, to be recovered by a personal action. It follows that the action of the court below upon the demurrer was correct.

It is well settled that a contract to share profits between parties does not necessarily create a partnership, as between themselves.   It is often merely a mode of ascertaining the compensation of an agent for his services.   Nor is there any rule of law or principle of public policy contravened by an agreement of the agent to indemnify his

principal against loss by the business, or to guarantee to him a certain profit in it. In a controversy between the parties or their representatives, as in this case, it is purely a question of intention, to be deduced from the contract itself.

In everything but the ownership of the property, the express stipulations of the contract create elements which perhaps might, *inter sese*, constitute a partnership, and yet the same stipulations are also consistent with the existence of the relation of principal and agent merely. See Story on Part. § 23. But there are other stipulations which seem to us to evince, quite satisfactorily, a definite intention to create an agency merely. In the first place, the vesting of the legal title to the lands in *Pomeroy*, exclusively, is a circumstance of much weight. He resided in a distant state, remote from the lands and from the market in which they would be sold, while *Ellsworth* lived near them, and he alone was charged with the duty of selling them. If both were sufficiently responsible, so that there would be no risk of loss by putting the title in either, why thus take care to vest it where it would be most inconvenient in obtaining prompt conveyances to purchasers, unless the parties regarded the land as *Pomeroy's* own property? Then, also, if a partnership was intended, why stipulate, in the first contract, that *Ellsworth* should "be the sole agent for selling," and "should take the care and agency of said lands as his attorney"? The language would be inapt. The words of the second contract are still more striking, and furnish a strong indication of what the parties understood by the first. "It is agreed that said *Ellsworth* shall take the agency of said lands in said White county, in all respects on the same terms he has those in *Benton* county; the agency to commence and end at the same time." This is no doubtful phraseology. Such language, though it might be known to a lawyer, of itself, not absolutely to preclude the idea of a partnership, would not probably have been employed by him. Non-professional draughtsmen would even be less likely to use such terms in a contract intended to be one of partnership. It is quite

evident, from a reading of these instruments, that they did not come from a professional pen. If not a partnership, then a community of interest in the property was not created by the contract. Upon the happening of a condition subsequently to be performed by *Ellsworth*, to-wit: the sale by him of sufficient lands to produce a fund in which he might be entitled to share, it might be that equity would, for his protection, if necessary to relieve him from the consequences of a refusal by *Pomeroy* to allow him to go on, lay its hand upon the specific fund, or turn the lands remaining unsold into money, and give to him his portion thereof. But the condition never happened, and never can, the time having expired, and of course the right which depended upon its performance never was called into existence. Any breach of it, therefore, by *Pomeroy*, or those representing him, can only be remedied by giving damages therefor.

Obviously, the contracts alone created no community of interest in the lands; nor was it contemplated that there ever should be such community of interest. *Ellsworth* was to sell the whole, and share a portion of the profits. Mere appreciation in the value of property, without realizing the cash from sales, was not to go to his benefit by any stipulation of the parties. It would be an important matter in ascertaining his damages for a breach by *Pomeroy* of the contract; but there could be no specific thing, a share of which he could claim, until profits were made by sales. It does not even appear by the complaint that he could, within the time limited by the agreement, have sold the lands so as to realize anything for himself, nor even that he intended to make the effort. Mere negotiations pending between the parties at *Pomeroy's* death could, of course, effect no change in the previous agreement; nor could an agreement with one of the trustees to whom the lands were devised. Nor do we deem the conclusion which we have reached at all in conflict with anything adjudged in *Olcott* v. *Wing*, 4 McL. 15, or *Watkinson*

v. *Ellsworth,* 27 Conn., 209. In the latter case there was no such question involved as determines the one before us. In the former, a partnership was held to exist, but the contract was very different from the one in this case.

The judgment is affirmed, with costs.

GREGORY, C. J., did not sit in this case.

*S. A. Huff* and *R. Jones,* for appellant.

*H. W. Chase* and *J. A. Wilstach,* for appellees.