## HAWLEY, ADMINISTRATOR, v. SMITH, ADMINISTRATOR.

PRINCIPAL AND AGENT.—*Death of Principal.*—*Effect of on Contract.*—By a written agreement between P., of Connecticut, and E., a resident of Indiana, P. furnished means to purchase a large quantity of lands in the latter state, the titles being taken in the name of P.; E. was to take the care and agency of said lands as the attorney of P. and to make no charge for commissions, diligence, skill, or personal services, but after P. was paid his original investment and ten per cent. interest thereon, from the proceeds of the sales of said lands, E. was to have half the residue for his services, and was to be sole agent for the sale of the lands for the term of four years, during which time they were all to be sold, unless the time should be extended by mutual agreement. No authority was conferred on E. to execute deeds as P.'s attorney. It was further agreed that P. should receive his capital so invested with ten per cent. interest thereon within four years, and in case any of said lands remained unsold at the end of four years, E. was to make no claim to any interest in such unsold lands, but they were to be wholly vested in P., his heirs, etc. Before the four years expired, P. died, leaving a will by which he devised said lands to certain persons; but no provision was made by the will for carrying out his contract with E. or for making deeds for such lands as E. might sell. The devisees took no measures to carry out the contract, and after the expiration of the four years sold the lands at a large advance over the cost price and ten per cent. interest.

*Held*, that the contract was one of agency and did not constitute a partnership, or give E. an interest in the lands themselves, but only in the surplus of the proceeds thereof.

*Held*, also, that the death of P., the principal, revoked the authority of E., the agent.

*Held*, also, that a power to sell coupled with an interest in the thing to be sold survives the grantor of the power; otherwise where the interest is in the proceeds only of the thing.

*Held*, also, that the failure of P. to provide by his will for carrying out the contract with E. was a breach of its terms, and that E. was entitled to recover from the estate of P. such sum as he could have realized by sales of the land within the four years limitation if his authority to sell had not been so terminated.

SUPREME COURT.—*Res Adjudicata.*—When the Supreme Court has laid down a rule of law, it will adhere to it in a subsequent action between the same parties, where a different decision would leave one party without remedy, even though doubtful of the correctness of the rule when applied to other cases.

From the Tippecanoe Civil Circuit Court.

*H. W. Chase* and *J. A. Wilstach*, for appellant.

*S. A. Huff* and *R. Jones*, for appellee.

BUSKIRK, J.—Smith, as administrator of Ellsworth, filed his

claim, verified by affidavit against Hawley, as administrator with the will annexed, of Pomeroy, in two paragraphs.

The first paragraph alleges that on the 10th of January, 1852, and on the 16th of March, 1854, the said decedents entered into written contracts as follows, to wit:

1. "I, Henry L. Ellsworth, of Lafayette, Tippecanoe county, Indiana, hereby make known, that whereas Benjamin Pomeroy, of Stonington, in New London county, and State of Connecticut, has procured and delivered to me (said Henry) nine land warrants for one hundred and sixty acres of land each, and three land warrants of eighty acres each, and twelve land warrants of forty acres each, with a power or letter of attorney attached, or accompanying each warrant or certificate, by the owners thereof respectively, authorizing and empowering me to locate the same; and whereas said Pomeroy has agreed to procure a deed from each of said owners (so far as it can be done without too great expense) conveying to himself the land to be located by virtue of said warrants or certificates and *said power of attorney*, as soon after the respective patents are issued as may be : Now, in consideration of the foregoing, and of the further agreements and stipulations hereinafter mentioned, on said Pomeroy's part to be performed, I (said Henry) agree to locate said warrants or certificates immediately, according to my best judgment and skill, to receive said deeds conveying said lands to said Pomeroy, cause the same to be recorded, to take the care and agency of said lands so conveyed to said Pomeroy, as his attorney, to sell and dispose of said lands, and to make no charge as agent for commissions, for locating, care, diligence, skill, or any personal services, but to charge for money paid out for recording deeds, taxes (if any are laid on said lands), and surveying (if any is needed), said Pomeroy having agreed to be at the whole expense of purchase of said lands of the patentees, and of procuring deeds of the same, the title to remain in him till *bona fide* sold, and the first proceeds of the sales of said lands, or any part thereof, to be paid over to said Pomeroy, until he is

Hawley, Adm'r, *v.* Smith, Adm'r.

reimbursed his capital invested in the purchase of said lands, which is to be reckoned at one hundred and fifteen dollars for a full warrant of one hundred and sixty acres, or seventy-one 87½-100 cents per acre, with interest thereon, at the rate of ten per cent. per annum, and to pay to me such sum of money as I shall have paid for recording deeds, taxes, and surveying, and balance or remainder of the proceeds of the sale of said lands to be divided equally between said Pomeroy and myself, I to be the sole agent for selling for the term of four years, during which period of four years all of said lands are to be sold unless longer time is mutually agreed upon by said Pomeroy and myself. No money to be expended on said lands unless mutually agreed upon as aforesaid. Now, in consideration of my right to one-half of said balance or remainder and the foregoing, I (said Henry) guarantee to said Pomeroy, his heirs and assigns, and bind myself, heirs, etc., that said Pomeroy shall receive his capital in said lands so invested as aforesaid, and ten per cent. thereon, within four years from this date ; and in case any of said lands remain unsold at the end of four years from this date, I, said Henry, will make no claim to any interest in such unsold lands thereafter, but that the same shall be wholly vested in said Pomeroy, his heirs and assigns, etc. The within and foregoing (on three pages) is a true copy of our agreement. In testimony whereof we have hereunto set our hands and seals this 10th day of Jan., 1852. The original, executed by Henry L. Ellsworth, is in the hands of Benj. Pomeroy. Henry L. Ellsworth [L. s.]—Present Thomas Wheeler."

2. "A memorandum of agreement between Benjamin Pomeroy of Stonington, Conn., and Henry L. Ellsworth of Lafayette, Ind., that whereas said Pomeroy owns certain lands in Benton county, Indiana, concerning the agency, sale, and division of profits of which, after deducting ten per cent. per annum on the agreed cost to said Pomeroy of said lands, to be said Pomeroy's wholly" (that is, the capital and ten per cent. thereon annually to be said Pomeroy's alone), "we have a contract bearing date 10th Jan., 1852 ; and whereas

said Pomeroy owns eight hundred acres of land in White county, Indiana, which it is agreed cost said Pomeroy one thousand dollars on the 10th of Jan., 1852. Now, it is agreed that said Ellsworth take the agency of said lands in White county, in all respects upon the same terms he has those in Benton county; agency to commence and end at the same time as for said lands in Benton connty; the only variation being in the cost of said lands in said White county, which cost one 25-100 dollars per acre, and those in Benton county seventy-one 87½-100 cents per acre; percentage on costs per annum of profit or interest and guarantee the same as on said contract; reference thereto being had now in each of our hands. 16th March, 1854, B. Pomeroy, H. L. Ellsworth."

Said first paragraph of claim then avers that the decedent Ellsworth located the land warrants, mentioned in the first contract, upon certain described lands in Benton county, in all two thousand one hundred and sixty acres, for the decedent Pomeroy, in whom the titles were afterward duly perfected, and that the decedent Ellsworth took the care and agency of the lands in both the counties of Benton and White, pursuant to the contracts.

It is further averred that on the 20th of September, 1855, the said Benjamin Pomeroy died, the titles of all the lands still remaining in him; that on the 17th of July, 1855, he made his will, which was probated in Connecticut on the 24th of September, 1855, and was afterward allowed by the Common Pleas Court of Benton county, Indiana. The only clauses of the will material to the proper decision of this case are quoted, and the first is as follows: " I give, devise, and bequeath to my sons Benjamin and Isaac Pomeroy, or the survivor of them, their heirs and assigns, in trust, all my lands in Indiana and Illinois, and all my real estate in Connecticut or elsewhere, to sell and dispose of the same, to the best advantage and as soon as possible in their discretion, and to pay the proceeds of the said trust, after deducting

taxes and expenses, to the bulk of my estate, and to be disposed of as hereinafter provided."

The will disposed of his estate to his wife and children, except an annuity of thirty dollars per year to a niece, and a legacy of seventy-five dollars to a widow Williams. The bulk of the testator's estate, which was to embrace the proceeds of sale of the Indiana and Illinois lands, including those mentioned in the contracts above set out, was disposed of to all the testator's children, as follows: "All the rest and residue of my estate, of whatsoever kind, I give, and devise, and bequeath to my sons, Benjamin, Isaac, and Cyrus, and to my daughters, Lydia, Rebecca, and Anna, their heirs and assigns, share and share alike."

It is further averred, that at the time of said Pomeroy's death, the four years within which the lands were to be disposed of had not expired; that by reason of his death and the disposition of said lands by his will, no sale of them could be made by said Ellsworth; that no new power to sell the lands was ever vested in him by said Pomeroy before his death, or by his devisees thereafter; that at and prior to said Pomeroy's death, he and said Ellsworth were negotiating about an extension of time for the sale of the lands beyond the 10th of January, 1856, which negotiations were terminated by said death before consummation; that afterward, to wit, June 1st, 1858, the said Isaac and Benjamin Pomeroy, as trustees under the will, sold all the lands to one Wolcott for $15,000, being an average of $5.07 per acre; that the investment of the decedent Pomeroy, with the agreed interest to the date of that sale, amounted to only $4,200, leaving $9,800 for division between the two estates; that the one-half of this sum, to wit, $4,900, with interest from June 1st, 1858, was due the Ellsworth estate, with the further sum of $64.17 for disbursements on account of the lands by Ellsworth; for all of which judgment was demanded.

The second paragraph of claim sets out the two contracts of January 10th, 1852, and March 16th, 1854, above copied;

avers that Ellsworth located the said 2160 acres of land warrants on lands in Benton county, perfected the titles in Pomeroy, and took the care and agency of these lands and the 800 acres in White county; that Pomeroy made his will in July, 1855, and died September 20th, 1855, still owning the land; that the will, which is copied, was duly probated in Connecticut, where he resided at the time of his death, which will was afterward allowed by the Common Pleas Court of Benton county; and "that the said Benjamin Pomeroy by his said will disposed of them, and thereby terminated the agency of the said Henry L. Ellsworth, respecting the said lands embraced in both said agreements; that but for said disposition of said lands by the said will, they might have been sold within the limit prescribed in the said agreements, so as to have realized in profit of at least $15,000, after paying to said Benjamin Pomeroy the original investment, and all outlay respecting the same, and ten per cent. per annum thereon; that one-half the said profit, to wit, $7,500, would have accrued to the said Henry L. Ellsworth but for the disposition of said lands by the said will, etc. The plaintiff claimed the said $7,500, the supposed half of the profits, with interest from January 10th, 1856, the time when the four years, during which sales were to be made, expired.

The defendant moved the court to strike out of the first paragraph all that part which related to a sale of the lands by the trustees under the will, to Wolcott, in June, 1858, for $15,000, and the claim of the appellee for a judgment based thereon. This motion was sustained, and the plaintiff excepted.

The defendant then filed separate demurrers to the two paragraphs of the claim, which the court overruled, and the defendant excepted.

The defendant then answered by a general denial.

The cause was submitted to the court for trial, and the finding was for the plaintiff, $10,146.81, to which the defend-

ant excepted, and moved for a new trial, upon written causes, as follows:

" 1. The finding and decision are not sustained by sufficient evidence.

" 2. The said finding and decision are contrary to law.

" 3. The damages found for plaintiff are excessive."

The motion was overruled, and judgment rendered upon the finding, to which the defendant excepted and filed a bill of exceptions, setting out all the evidence.

Having thus succinctly stated the pleadings and the rulings of the court, etc., we proceed to an examination of the evidence in the case.   The plaintiff read in evidence the contracts between the decedents in reference to the lands, and proved that the lands were located and conveyed to Pomeroy as charged.   And it was admitted that those in White county were worth $6.00 per acre, and those in Benton county $4.00 per acre, on the 10th of January, 1856; in all - - - - - -    $13,440.00

The contracts show that Pomeroy's
   whole investment, made January
   10th, 1852, was  -   -   - $2,552.40
Interest at 10 per cent. for four
   years,  -   -   -   -   - 1,020.96
                                      3,573.36

Leaving gross profits, claimed, -    $9,870.64
Deduct Ellsworth's disbursements,      64.17

Total profits claimed by appellee,     $9,806.47
One-half of this sum is   -   -      4,903.23
Add for Ellsworth's disbursements,      64.17
Claim  of appellee as due Ellsworth's estate, Jan. 10th, 1856,    $4,967.40
Add interest at 6 per cent. to date
   of judgment below, seventeen
   years and upwards  -   -   -    5,179.41

Amount of finding and judgment,     $10,146.81

William S. Peckham was the only witness called, the other evidence being all documentary.   Mr. Peckham testified as follows: "I entered the employment of Henry L. Ellsworth, late of Tippecanoe county, Indiana, deceased, in April, 1852, and continued with him until his death in December, 1858. Mr. Ellsworth lived in Lafayette, Indiana, and was engaged in farming and in buying and selling real estate while I was in his employment.   He commenced to buy for parties lands in Indiana in 1833, and was paid by a share of the profits arising from the sales of the lands, after reimbursing the capital expended in the purchase and the interest.   The most of his principals, those for whom he made such purchases and sales of lands, resided in the eastern states.   I have and had a general knowledge of the Pomeroy lands, that is, those referred to in the contracts between Mr. Ellsworth and Mr. Pomeroy.   In 1855, I know that Mr. Ellsworth talked considerably about selling these Pomeroy lands, as his interest in them was contingent upon his making sale of them, and he intended to make sale of them in some way within the time limited by the contracts.   I don't know that he could have made a sale of these lands by retailing them in parcels during the last three or four months of that year.   He could not have retailed them probably in the ordinary course.   I believe he did make two or three small sales.   His connections with business men east were such that he could have effected a sale at some price of the lands, of the whole of them, so as to have realized a profit to himself."

Question by plaintiff.   "In making sales of lands, where there is nothing but that to do, what would have been the commission?"

Answer.   "Five per cent. on sales in retail way.   When large bodies were sold together, two and a half to three per cent. would have been the rates of commission.   The items in the bill of particulars marked F, attached to the complaint or claim, amounting to sixty-four dollars and seven-

teen cents, are correct.   The disbursements were made by Mr. Ellsworth and are due from the Pomeroy estate."

On his cross-examination, he said: "I was the confidential agent and book-keeper of Mr. Ellsworth during a part of the time, but during the years 1855 and 1856, he did the most of his correspondence himself.   I attended to collections, receipts of money, etc.   My recollection is, that the market for lands was rather dull in Benton and White counties during the years 1855 and 1856.   There was one or two other sales made verbally by Mr. Ellsworth of the Pomeroy lands in White county, at six dollars per acre, during the year 1855 or 1856.   Stark Olmstead verbally agreed to take eighty acres, certain, and I don't know but one hundred and sixty acres, at six dollars per acre on about the usual terms, that is, one-fourth cash and the residue on one, two, and three years time.   I don't think any papers were prepared.   I can't remember the piece of land he agreed to take.   I don't remember any other sales that were made.   Stark Olmstead said that there were two or three other parties talking of buying some of these lands.   There was some difficulty about the titles.   Mr. Ellsworth sold him some other lands, near the Pomeroy lands.   Mr. Olmstead's talk of the purchase of the Pomeroy lands was before the 10th of January, 1856.   I think it was about the time of Pomeroy's death that Olmstead was in to buy the lands, but I cannot say whether it was before or after Pomeroy's death.   I was all the time in Mr. Ellsworth's office during the time I was in his employ, that is, my business was in his office.   I don't remember of any other negotiations for the purchase or sale of any of the Pomeroy lands except what I have testified to. The difficulty about the title was, that there was no one to make the title, Pomeroy having died.   Mr. Ellsworth heard of Pomeroy's death by letter from his sons, soon after it occurred."

The appellee also introduced thirteen letters which passed between the parties in reference to these lands.   We state the substance of these letters in their chronological order,

although not in the order in which they were read in evidence or appear in the record.

No. 1. The first letter is from Benjamin Pomeroy to Mr. Ellsworth, written from Stonington, Conn., July 19th, 1855, in which the writer states that he had an offer that would have netted three dollars an acre or over, for all the lands, which he seemed desirous of taking, but could not without Ellsworth's consent, and asked his views, etc. He thinks it desirable to trade a part of the lands for a farm, and wants to know if he shall make the trade.

No. 2. On the 24th of July, 1855, Mr. Ellsworth answers, directing Pomeroy to delay his trade for a time, and promising to go upon the land the next day and give his opinion fully.

No. 3. Pomeroy wrote again on the 8th of August, 1855, stating that he not heard from Mr. Ellsworth, and expressed great anxiety to have the lands sold, and fears a decline, but stated that he has suspended negotiations for selling or exchanging the lands, and awaits a reply, and advice and direction.

No. 4. On the 4th of August, Mr. Ellsworth wrote Pomeroy a letter, which the latter appears not to have received when he wrote on the 8th of August, stating that he had examined the White county lands (eight hundred acres), and thinks it would be a sacrifice to sell them at three dollars per acre, and urges that Pomeroy shall extend the time for a sale of the lands for one year.

No. 5. On the 25th of August, 1855, Pomeroy wrote Ellsworth, in answer to a letter of the 18th of that month, which was not introduced in evidence. In this letter, Pomeroy gives his understanding of the rights of the parties under the two contracts, which he insists are but one, expresses his anxiety to have the lands sold, is inclined to sell to Ellsworth at three dollars for the White county lands, and thinks that they may agree upon an extension of time for the sale of a part of the lands, invites an offer from Ellsworth for the lands, etc.

This was the last letter written by Benjamin Pomeroy or

by his authority, prior to his death, upon the subject of the lands.

No. 6. On the 27th of September, 1855, Isaac Pomeroy, a son of Benjamin Pomeroy and one of the trustees under the will, wrote to Mr. Ellsworth, announcing the death of his father, and advising him of the making and probate of the will, and asking advice and suggestions about the lands and what course they should pursue in regard to them.

No. 7. Mr. Ellsworth answered Isaac Pomeroy on the 1st of October, 1855, and, after expressing regrets for the death of his father, etc., states that there is a bond in regard to the lands, which will soon expire, says that he and deceased were corresponding about a sale of those in White county at three dollars per acre, but that he, Ellsworth, had advised to hold the lands and repeats the advice to the heirs, and adds, "I will however give you all information that you need; my bond, left among your father's papers, will show everything fully."

No. 8. On the 10th of December, 1855, Mr. Ellsworth wrote to Isaac Pomeroy, stating that he, Ellsworth, had been sick and unfit for business, which probably accounts for the way in which the letter was signed, that is, with the name of Mr. Pomeroy instead of the writer's; that he sent a plat of the lands, recapitulates the terms of the contracts, says he must make a sale of the lands within the time or lose by the failure, offers to pay the Pomeroy estate three thousand five hundred and seventy-three dollars and fifty cents, the original investment, and ten per cent. interest, on the 10th of January, 1856, or go on and sell the lands; but advises that the lands should be held for one or two years longer, says he has an offer for one hundred and sixty acres in White county at five dollars per acre, "and should advise to it, and perhaps have the power to sell already," and talks encouragingly about the lands if further time can be had after the contract expires for their sale.

No. 9. Isaac Pomeroy replied to the above from Mr.

Hawley, Adm'r, *v.* Smith, Adm'r.

Ellsworth, on the 17th of December, 1855, by letter, in which he speaks of seeing Mr. Ellsworth in New York shortly before, and hoped to have had a reasonable offer for the lands, but declines to sell the whole to Ellsworth for the three thousand five hundred and seventy-three dollars and fifty cents, as offered by him, does not feel authorized to consent to a sale of the one hundred and sixty acres in White county at five dollars per acre until he can see them, as he believes that these lands are superior to those in Benton county, and promises, if it is possible, to visit Indiana before the 10th of January, 1856, and look at the lands. At the close of this letter, Pomeroy says : " Your letter " (No. 8) "appears to bear date the 10th of November, 1855, though mailed on the 11th of December, 1855, nor is it signed by you but apparently by me."

No. 10. On the 28th of December, 1855, Isaac Pomeroy again wrote to Ellsworth in reference to a letter of the latter, not introduced in evidence, stating that the writer would be detained by an important matter in the Supreme Court in New York, to be attended to on the 3d of January, 1856, but would leave for the West and hoped to be in Lafayette before the 10th of January, and would leave the land matters as they were until he could see Mr. Ellsworth, etc., and closes by assuring Mr. Ellsworth that he shall not be called upon in any contingency to pay anything on account of his guaranty upon the land contracts.

No. 11. On the 5th of January, 1856, Isaac Pomeroy again wrote to Mr. Ellsworth, that owing to the sickness of counsel, he was detained longer in New York than he expected to be, and he would be unable to reach Lafayette by the 10th of that month as he expected, and added, " I am not prepared to make any definite proposition to you or to accept any of yours, yet I am at liberty to say that I shall probably treat with you in the same manner when we meet, as though the 10th inst. had not then have elapsed."

No. 12. On the 13th of February, 1856, Isaac Pomeroy again wrote to Mr. Ellsworth, saying that the weather had

been such that he had been deterred from venturing West, but would start for Lafayette as soon as the weather would permit, to examine the lands and make arrangements for sale to Ellsworth or some one else, as should seem best.

No. 13. On the 10th of July, 1856, Isaac Pomeroy again wrote to Mr. Ellsworth in response to a letter of his of the 7th of that month, which is not in evidence. This letter of Pomeroy's alludes to the fact that the writer had been in Lafayette, by saying " I wrote you that all the papers and memoranda which I received while at your place, had been lost with my pocket-book on my return." Pomeroy also recognizes a sale, which it appears was claimed by Ellsworth to have been made by him of two quarter sections of the White county lands, as being made under the contracts between the parties, and proposes to prepare agreements, etc., to the purchasers, but declines to renew or extend the time for the sale of the lands and gives his reasons therefor, etc.

The appellee then read in evidence the will of Benjamin Pomeroy with the probate thereof in Connecticut, which, it was admitted by both parties, was not allowed or recorded in Indiana until 1863, and rested.

The appellant introduced no evidence.

The following are the errors assigned:

1. The court erred in overruling the demurrer to the first paragraph of the claim.

2. The court erred in overruling the demurrer to the second paragraph of the claim.

3. The court erred in overruling the defendant's motion for a new trial.

The first question presented for our consideration and decision is, whether the court erred in overruling the demurrer to the first and second paragraphs of the complaint.

The positions assumed by counsel for appellant in reference to the sufficiency of the complaint are stated as follows in their brief:

" The demurrers to the claim should have been sustained.

" 1. After the court had granted the motion to strike out

that part of the first paragraph which based the right of recovery upon the sale of the lands by the trustees under Mr. Pomeroy's will to Wolcott in 1858, there was nothing left upon which to found a demand for anything for the Ellsworth estate. There was no averment left showing that the lands had been sold by Ellsworth, or that they had, during or at the expiration of the four years, any value above what was necessary to reimburse Pomeroy his principal and agreed interest. If they were not worth more than was due Pomeroy, then the will and death of Pomeroy, even though they revoked Ellsworth's power to sell, as alleged, wrought no injury to him. If they were worth more, it was the duty of the pleader to aver it as a substantive fact in support of the plaintiff's claim, and the failure to do so renders the paragraph insufficient. This objection also cuts off all right for a recovery by Ellsworth of the sixty-four dollars and seventeen cents, because even those disbursements were to be paid only from the proceeds of a sale of the lands after Pomeroy had been satisfied. If, therefore, it is not averred that the lands were worth more than was due to, or was needed to satisfy, Pomeroy, there is no fund shown to exist out of which Ellsworth had a right to be paid his disbursements.

" 2. The second paragraph of the claim is predicated upon the erroneous theory that Pomeroy's death and the probating of his will in Connecticut some three months before the expiration of the four years, operated as a wrongful abrogation of Ellsworth's power to sell, and gave him all the rights and benefits that he would have been entitled to under the contracts, had he made a sale of all the lands at their full value for cash, during or even on the last day of his agency.

" We insist that Mr. Pomeroy's death and such probating of his will did not revoke the power of sale of the lands by Ellsworth during the four years, and that consequently all right to compensation by the latter ceased when the period passed in which such sales were to be made."

We are of opinion that the position assumed by counsel for appellant in reference to the first paragraph of the com-

plaint is correct. It is insisted by counsel for appellee, that, as the contracts between Ellsworth and Pomeroy were made a part of the complaint, the first paragraph was sufficient. We do not think so. The contracts of themselves did not show any right of recovery. The action was founded upon the contracts, but, to entitle the appellee to recover, it was necessary for him to aver and prove, either that the lands had been sold by Ellsworth for a sum greater than was necessary to reimburse Pomeroy, or that the lands at the death of Pomeroy, or at any time from his death down to the expiration of the four years, possessed a value above what was necessary to reimburse Pomeroy his principal and agreed interest. After the motion to strike out that portion of the complaint which alleged the sale to Wolcott was sustained, there was nothing left in the first paragraph in relation to the value of the lands. As the first paragraph of the complaint now is, there is no cause of action shown in favor of the appellee. We think the court erred in overruling the demurrer thereto.

The second paragraph of the complaint is not subject to the objection which is urged to the first. The second contains the averment, "that the said Benjamin Pomeroy by his said will disposed of them and thereby terminated the agency of the said Henry L. Ellsworth respecting the said lands embraced in both said agreements; that but for said disposition of said lands by the said .will, they might have been sold within the limit prescribed in the said agreements, so as to have realized in profit of at least fifteen thousand dollars, after paying to said Benjamin Pomeroy the original investment and all outlay respecting the same, and ten per cent. per annum thereon ; that one-half the said profit, to wit; seven thousand .five hundred dollars would have accrued to the said Henry L. Ellsworth but for the disposition of said lands by the said will," etc. The plaintiff claimed the said seven thousand five hundred dollars, the supposed half of the profits, with interest from January 10th, 1856, the time when the four years during which sales were to be made expired.

Under the second paragraph, all the facts proved were admissible, and it plainly and obviously appears from the record that the finding and judgment proceeded wholly upon the second paragraph of the complaint, in which case the overruling of the demurrer to the first paragraph was a harmless error. *Blasingame* v. *Blasingame,* 24 Ind. 86; *Wolf* v. *Schofield,* 38 Ind. 175; *Peery* v. *The Greensburgh, etc., Co.,* 43 Ind. 321. The appellant, therefore, was not injured by the ruling of the court in reference to the demurrer to the first paragraph.

We proceed to inquire whether the second paragraph of the complaint was in other respects good. This leads to an inquiry in reference to the nature of the contracts upon which the action is founded, and the rights and obligations created thereby.

By the first contract, it was agreed that Pomeroy should furnish to Ellsworth land warrants, and he should locate them, and perfect the titles in Pomeroy, take charge of the lands, and have the sole right to sell them for four years, and if there was a profit made by such sales, after paying to Pomeroy his investment and any money paid out for surveying, etc., with ten per cent. annual interest, then Ellsworth should have one-half the profits. Ellsworth guaranteed to Pomeroy that he should receive from the sales his investment with ten per cent. interest per annum. Ellsworth not to claim any interest in the lands unsold at the expiration of the four years. This contract dated 10th of January, 1852.

The 16th of March, 1854, an agreement was made by which the parties made the first agreement (except as to the purchase of lands) apply to certain lands then owned by Pomeroy. Ellsworth resided at Lafayette, Indiana, near the lands, Pomeroy at Stonington, Conn.

Ellsworth performed all that was to be done by him, except making the sales. By the agreement, Ellsworth must make the sales before the 10th of January, 1856, and the letters offered in evidence show that he was fully aware of this fact, and intended to do so, unless he could make some new

arrangement with Pomeroy. That he could make the sales within the time, he did not doubt, or he would have assented to the sale proposed in the summer of 1855 by Pomeroy, at three dollars per acre, and this would have yielded a large profit. But he believed a larger profit could be made by continuing to hold the lands, and the correspondence shows that negotiations to that end were going on during the latter part of the summer, Ellsworth among other offers proposing to pay Pomeroy one-half his investment, and to hold the lands jointly.

On the 20th of September, 1855, Pomeroy died, having on the 17th day of July, 1855, made his will, which was regularly probated in Connecticut on the 24th of September, 1855. By it, these Indiana lands were given to the devisees named, and no provision was made in relation to the contract with Ellsworth.

This is the second action which has been brought by the personal representative of Ellsworth against the personal representative of Pomeroy, on the contracts which are the foundation of the present action. The former action proceeded upon the theory that by such contracts Ellsworth and Pomeroy became partners in such lands, and that Ellsworth was entitled to share in the profits resulting from the sale thereof. A demurrer was sustained in the court below to the complaint, from which ruling an appeal was taken to this court, where the judgment was affirmed. The case is reported in 26 Ind. 158. The following extract from the opinion of the court in that case will show the ground upon which the ruling was based:

" It is conceded that if Ellsworth had no equitable interest in the lands, or in the fund to arise from the sale of them, but only a claim against Pomeroy, in person, for services and expenditures as agent of the latter, then this suit will not lie.

" The only question presented for consideration is, whether Ellsworth had, in equity, any interest in the land. Did the contracts constitute a partnership between the parties to it,

with a joint interest in the property itself, or did they create merely the relation of principal and agent?

"After much consideration we have reached the conclusion that the relation of the parties was that of principal and agent. That the agent was to be liable for all losses, to guarantee a certain profit to Pomeroy, and was to be compensated by a certain share of the remaining profits which should be realized by actual sales of the lands, which might be made within a limited time, and that after the expiration of that time the agency should cease. A breach of the contract by Pomeroy, in preventing the agent from executing it, and thereby reaping its advantages, would be properly compensated only in damages, to be recovered by a personal action. It follows that the action of the court below upon the demurrer was correct."

The learned judge who delivered the opinion of the court in the above case, in the subsequent case of *Ellsworth* v. *Mace*, 33 Ind. 73, characterized it as "a close case," and distinguished it from the case then in judgment, as follows: "There the contract was one of agency; Ellsworth, the agent, to be compensated for his services, not by an interest in the land, but out of the proceeds of the sales to be made by him within a certain period, and not afterwards, first reimbursing Pomeroy his investment. The agent had not made any sales, and was prevented by Pomeroy's death from discharging the service contemplated by the contract within the time limited; and it did not appear that if left at full liberty to sell, Ellsworth could, within the time fixed, have realized anything as profits to be divided. Here, however, the contract is altogether different. The formal relation of principal and agent is created, it is true, and some service is to be rendered by Ellsworth.

"A small portion of the lands sold within the period fixed, affords a fund as profits to be divided, and the lands now in question remain. It is difficult to conceive of a trust, plainly and explicitly declared, if this be not a trust, and

we know not how the proposition can be set in a clearer light than appears by a statement of the case.

"It is argued that Wheeler and Ellsworth were not partners. We are inclined to agree that they were not; but it does not follow that there was no trust, and that Ellsworth acquired no equity in the lands by the arrangement and events which occurred. A trust is an equitable interest in property distinct from its legal ownership. He who holds the legal title is trustee, and he for whose benefit it is held is the *cestui que trust.*"

It having been held in the former action between the same parties, on the same cause of action, that the relation of principal and agent existed, we should regard the question as *res adjudicata* between the parties. This should be the rule, even if we doubted the correctness of the ruling when applied to other cases. See cases supporting this proposition, collected· and cited in 3 Estee Pl. & Pr. 762, 763. The former action was defeated, because this court held that Pomeroy and Ellsworth were not partners in the land, and if we should now hold that they were partners, great and manifest injustice would be done to the appellee. We shall regard it as settled, that Pomeroy was the absolute owner in fee of the lands in question; that while Ellsworth had an interest in the profits, if any were realized from the sale of the lands, he had none in the land itself; and that Pomeroy was, under and by virtue of the contracts set out in the complaint, the principal, and Ellsworth his agent. The right of Ellsworth to share in the profits created a relation of trust in reference to the proceeds of the sale, but not in the land itself. Pomeroy owned the land. Ellsworth was his agent for its sale. The conveyances for the lands sold were to be made by Pomeroy. Ellsworth possessed no power to convey the lands he might sell. His power was restricted to the right of entering into executory contracts for the sale of the lands, in the name and as the agent of Pomeroy. By the express terms of the contracts, the lands were to be sold within four years. They were not

sold within the time limited. The right of the appellee to recover in the present action depends upon whether Ellsworth was prevented from selling the lands within the time limited by the acts of Pomeroy. One who seeks to recover upon a contract must either show that he has performed the covenants on his part to be performed, or that he was prevented, in whole or in part, from performing by the acts of the other party to such contract. Ellsworth accepted of the agency, located the land warrants in the name of Pomeroy, and offered them for sale, but did not sell the lands within the time limited. If the responsibility for this failure rests upon Ellsworth, he cannot recover; but if the power of Ellsworth to perform was taken away by the acts of Pomeroy, and further acts of performance were rendered impossible, he is not chargeable with the failure, and may recover. When one party to a contract has refused to perform his part of the contract, or has rendered performance on the part of the other impossible, performance on the part of the other is excused. *Turner* v. *Parry*, 27 Ind. 163; *North's Adm'rs* v. *Pepper*, 21 Wend. 636; *Skinner* v. *Tinker*, 34 Barb. 333; *Crary* v. *Smith*, 2 Comst. 60.

The rule is, that when the performance by one party is prevented by the act of the other, the party not in fault should recover in damages such sum as will fully compensate him for the injury which he has sustained by reason of the non-performance of the contract. The law is settled that where a precedent condition was to have been performed by the plaintiff, but its performance has been prevented by the defendant, such prevention may be averred as an excuse for non-performance of such precedent condition. *Ruble* v. *Massey*, 2 Ind. 636; *Hotham* v. *The East India Company*, 1 T. R. 638; *Heard* v. *Wadham*, 1 East, 619.

The sale of the lands in question within four years constituted a condition precedent to Ellsworth's right to share in the proceeds of the sale. It is admitted that he did not perform the precedent condition. Was he prevented from performing by the acts of Pomeroy? It is claimed by coun-

sel for appellee that the execution of his will by Pomeroy, devising absolutely the lands in question to his two sons, without making any provision for carrying out the contracts with Ellsworth, and his subsequent death, deprived Ellsworth of the authority and power to perform the precedent condition. The solution of this question depends upon whether the death of Pomeroy, the principal, revoked the authority of Ellsworth, the agent. That the death of the principal revokes the authority of the agent, is admitted by the counsel for appellant to be true as a general proposition, but they say that Ellsworth had an interest coupled with his authority, and therefore it was not revoked. It is, on the other hand, argued by counsel for appellee, that this court held in the former action between these parties, based on the same cause of action, that Ellsworth had no interest in the lands themselves; that the equitable interest which Ellsworth had, under such decision, in the proceeds resulting from the sale of such lands, is not the kind of interest which would prevent the death of Pomeroy operating to revoke his authority; that the interest, coupled with authority, that prevents the death of the principal from producing a revocation of the authority of the agent is an interest in the thing itself, such as will enable the agent in his own name to transfer the right to it to another, as when he is invested with the title to realty, or with the apparent ownership of personalty, and can in his own name, without mentioning his principal, convey the realty or transfer the personalty.

The case of *Hunt* v. *Rousmaniere's Executors*, reported in 2 Mason, 244, and in 8 Wheaton, 174, is the leading case in this country upon the subject under examination. The opinion of the circuit court was delivered by Judge Story, who explained what was meant by "a power coupled with an interest." He says: "I do not understand the terms, 'a power coupled with an interest,' exactly in the same broad sense, as they seem to be understood in the argument at the bar. The case of *Bergen* v. *Bennett*, 1 Caines Cas. in Err. 1, cited at the bar, is certainly good law, and it

will illustrate the distinction between naked powers and powers coupled with an interest. There the party mortgaged an estate as collateral security, and gave authority to the grantee to sell the estate absolutely. And the court held, that this was a power coupled with an interest, and that the grantee might well sell the estate, notwithstanding the death of the grantor. But if he did sell, in whose name was the deed to be made? Plainly not in the name of the grantor, for he was dead; but in the name of the grantee, as his own act, in virtue of his power, and as having an interest in the estate conveyed. But suppose instead of a mortgage of the estate, there had been a mere power of attorney authorizing the party to sell the land, and apply the proceeds to the payment of the debt, for which such power was given as collateral security, there the power would not be coupled with any estate in the land; but would be a mere naked power to sell, and could not be executed after the death of the grantor of the power. There is a difference between a power coupled with an interest in the property itself, and a mere interest or benefit in the execution of a power."

The opinion of the Supreme Court was delivered by MARSHALL, C. J., who says: "This instrument contains no words of conveyance or of assignment, but is a simple power to sell and convey. As the power of one man to act for another depends on the will and license of that other, the power ceases when the will, or this permission, is withdrawn. The general rule, therefore, is, that a letter of attorney may, at any time, be revoked by the party who makes it, and is revoked by his death. But this general rule, which results from the nature of the act, has sustained some modification. Where a letter of attorney forms a part of a contract, and is a security for money, or for the performance of any act which is deemed valuable, it is generally made irrevocable in terms, or if not so, is deemed irrevocable in law. Although a letter of attorney depends, from its nature, on the will of the person making it, and may, in general, be recalled at his will; yet, if he binds himself for a consider-

ation, in terms, or by the nature of his contract, not to change his will, the law will not permit him to change it. Rousmanier, therefore, could not, during his life, by any act of his own, have revoked this letter of attorney. But does it retain its efficacy after his death? We think it does not. We think it well settled, that a power of attorney, though irrevocable during the life of the party, becomes extinct by his death.

"This general rule, that a power ceases with the life of the person giving it, admits of one exception. If a power be coupled with an 'interest,' it survives the person giving it, and may be executed after his death. As this proposition is laid down too positively in the books to be controverted, it becomes necessary to inquire what is meant by the expression, 'a power coupled with an interest.' Is it an interest in the subject on which the power is to be exercised, or is it an interest in that which is produced by the exercise of the power? We hold it to be clear, that the interest which can protect a power after the death of a person who creates it, must be an interest in the thing itself. In other words, the power must be engrafted on an estate in the thing. The words themselves should seem to import this meaning. 'A power coupled with an interest,' is a power which accompanies, or is connected with, an interest. The power and the interest are united in the same person. But if we are to understand by the word 'interest' an interest in that which is to be produced by the exercise of the power, then they are never united. The power, to produce the interest, must be exercised, and by its exercise, is extinguished. The power ceases when the interest commences, and, therefore, cannot, in accurate law language, be said to be 'coupled' with it.

" But the substantial basis of the opinion of the court on this point, is founded in the legal reason of the principle. The interest or title of the thing being vested in the person who gives the power, remains in him, unless it be conveyed with the power, and can pass out of him only by a regular

act in his own name. The act of the substitute, therefore, which, in such a case, is the act of the principal, to be legally effectual, must be in his name, must be such an act as the principal himself would be capable of performing, and which would be valid if performed by him. Such a power necessarily ceases with the life of the person making it.

"But if the interest, or estate, passes with the power, and vests in the person by whom the power is to be exercised, such person acts in his own name. The estate being in him, passes from him by a conveyance in his own name. He is no longer a substitute, acting in the place and name of another, but is a principal acting in his own name, in pursuance of powers which limit his estate.

"The legal reason which limits a power to the life of the person giving it exists no longer, and the rule ceases with the reason on which it is founded. The intention of the. instrument may be effected without violating any legal principle."

The law is stated thus by Parsons on Contracts: "The death of the principal operates *per se* as a revocation of the agency. But not if the agency is coupled with an interest vested in the agent. Then it survives, and the agent may do all that is necessary to realize his interest and make it beneficial to himself. Such an agency is not revocable at the pleasure of the principal in his lifetime, and if the agent dies the agency passes over to his representatives. To determine whether the agency be thus irrevocable, it is an important if not a decisive question, whether the act authorized could be performed by the agent in his own name, or only by him as an agent, and in the name of the principal. In the first case, if an interest were coupled with the agency, the authority would survive the death of the principal, and the agent might perform the act in the same manner after the death as before. In the latter case, as he could no longer use the name of the principal, for the obvious reason that one who is dead can no longer act, it would seem that his

right must be limited to that of requiring the representatives of the deceased to perform the act necessary for his protection.

"Unless the authority is thus coupled with an interest, it would seem the word 'irrevocable' does not take away the power of revocation.

"The revocation is not prevented by any interest in the money to come from the exercise of the authority; but the interest must be in the property on which the power is to be exercised."

Counsel for appellant rely upon section 477 of Story on Agency, which is as follows:

"But, where an authority or power is coupled with an interest, or where it is given for a valuable consideration, or where it is a part of a security, there, unless there is an express stipulation that it shall be revocable, it is, from its own nature and character, in contemplation of law, irrevocable, whether it is expressed to be so upon the face of the instrument, conferring the authority, or not."

The above is doubtless good law when applied, as was done by the learned author, to the power of the principal to revoke in his lifetime, but it has no application to the effect of the death of the principal upon the power of the agent, as is shown by sections 488 and 489 of the same work, which are as follows:

"Sec. 488. Fifthly. A revocation may be, by operation of law, by the death either of the principal or of the agent. This is an ancient and well-settled doctrine of the common law. It will make no difference, that the power is declared in express terms to be irrevocable; for, if it be not coupled with an interest, although irrevocable by the party, it is revoked by his death. The doctrine seems to be a natural deduction or presumption of the actual intention of the parties. But it has this additional reason to support it, that, as the act must, if done at all, be done in the name of the principal, it is impossible that it can properly be done, since a dead man can do no act; and we have already seen that

every authority, executed for another person, presupposes that the party could, at the time, by his personal execution of it, have made the act valid.

"Sec. 489. The only admitted exception in our law, if, indeed, that properly constitutes an exception, is the case, where the power or authority is coupled with an interest in the thing, actually vested in the agent. The reason of this exception is entirely compatible with the general ground upon which the rule is founded. It is, that the agent having the legal title to the property vested in himself, is capable of transferring it in his own name, notwithstanding the death of the principal; and the death of the principal, therefore, has no operation upon his act. The power, given by the principal, is, under such circumstances, rather an assent or agreement that the agent may transfer the property vested in him, free from any equities of the principal, than strictly a power to transfer."

In *Davis* v. *Lane*, 10 N. H. 156, the court held that "the authorities show that the death of the constituent terminates the authority, unless the power is coupled with an interest so that it may be executed in the name of the agent."

In *Barr* v. *Schrœder*, 32 Cal. 609, the court say: "The interest which the party to whom the power is given must have, in order to render the power irrevocable, must be an interest in the property on which the power is to be exercised. It is not enough that the donee of the power is interested in that which is produced by the exercise of the power. If his interest is thus limited the power and the interest cannot be coupled, for the proceeds do not arise until after the power has been exercised, and when it is exercised it is extinguished."

We have examined the following authorities and find that they fully sustain the views hereinbefore expressed: 2 Livermore Agency, 302; Dunlap's Paley Agency, 186, 187, and note 5, commencing on page 187; *Watson* v. *King*, 4 Camp. 272; *Gaussen* v. *Morton*, 10 B. & C. 731; *Walsh* v. *Whitcomb*, 2 Esp. 565; *Allen* v. *Davis*, 13 Ark. 28; *Mar-*

*field* v. *Goodhue*, 3 Comst. 62; *Houghtaling* v. *Marvin*, 7 Barb. 412; *Wilson* v. *Edmonds*, 4 Fost. N. H. 517; *MacGregor* v. *Gardner*, 14 Iowa, 326; 2 Kent. Com., Lect. 41, pp. 645, 646, (4th ed.); *Shipman* v. *Thompson*, Willes, 104, note (*a*); Story Bailments, sec. 209; *Michigan Ins. Co.* v. *Leavenworth*, 30 Vt. 11; *Marziou* v. *Pioche*, 8 Cal. 522; *Knapp* v. *Alvord*, 10 Paige, 205; *Merrick's Estate*, 8 Watts & S. 402; *Irwin* v. *Workman*, 3 Watts, 357; *Smyth* v. *Craig*, 3 Watts & S. 14; *Gage* v. *Allison*, 1 Brevard, 495; *City Council* v. *Duncan*, 3 Brev. 386; *Johnson* v. *Wilcox*, 25 Ind. 182.

Counsel for appellant have referred us to three cases in Pennsylvania as sustaining the position assumed by them, and they are, *Coffin* v. *Landis*, 46 Pa. St. 426,. *Blackstone* v. *Buttermore*, 53 Pa. St. 266, and *Marvine* v. *Drexel*, 68 Pa. St. 362.

The only point decided in the case first cited is, that where one as agent for another, contracts to sell the lands of the latter in consideration of one-half of the net proceeds of the sales, and there is no stipulation in the contract as to the duration of the employment, the principal has a right to terminate it at any time, and to discharge the agent from his service without notice. We do not think the principle decided has much application to the present case, but so far as it has it is against the appellant, as it holds that the principal might revoke the authority of his agent, although he had an interest in the proceeds of the sales.

The second case cited is squarely against the appellant. The question involved was the power of the principal to revoke the authority of the agent. Upon the question of " an interest coupled with a power," the court refer to and follow the ruling in *Hunt* v. *Rousmaniere's Ex'rs*, *supra*, and then say: " An interest in the proceeds to arise as mere compensation for the service of executing the power will not make the power irrevocable."

The third case cited is very different in its facts and the principle decided, to the present one. There, Marvine con-

veyed to Drexel certain city lots, he agreeing to sell and pay Marvine one-fourth of the profits. Drexel died, having made his will, ordering his executors to sell his real estate, "whenever they think proper." Marvine and the executors not agreeing upon the mode of sale, he applied to a court of equity to determine the manner of sale, and the court decreed the manner in which the lands conveyed by Marvine should be sold. The above case would be in point here if Pomeroy had conveyed the lands in question to Ellsworth, upon an agreement on his part to sell and *divide* the profits resulting from the sale, and Ellsworth had devised the lands and died, and his executors had proceeded to sell the lands in a manner injurious to Pomeroy, and he had sought the aid of a court of chancery to restrain the executors from selling at their mere discretion.

The general rule is, that a power of attorney constituting a mere agency is always revocable by the principal. But where the power is coupled with an interest in the estate, or where the letter of attorney forms a part of a contract, and is a security for money, or for the performance of any act which is deemed valuable, it is generally deemed irrevocable by the principal.

The general rule is, that the death of the principal operates *per se* as a revocation of the agency, but this rule admits of one exception, and that is, where the power is coupled with an interest in the estate itself, and the title is so vested in the person to whom the power is given, that he may sell and convey in his own name. The power is revoked by the death of the principal, although the power is coupled with an interest in the estate, if the title remains in the principal, so that the agent will have to execute the power in the name of the principal.

We are very clearly of the opinion that the death of Pomeroy revoked the authority of Ellsworth, and thereby rendered it impossible for him to sell the lands within the time limited, and that such revocation entitles Ellsworth to recover such compensation in damages as will be equal in amount with

his share of the profits which would have resulted had the lands been sold by him. It is, however, claimed that the damages are excessive. The point relied upon is, that it is shown by the evidence that it would have been worth from two and one-half to three per cent. to sell the lands altogether, and five per cent. to have sold them in parcels, and that as Ellsworth did not sell the lands, a reasonable deduction should be made for such services as he was required to but did not perform. We do not regard the argument as sound. The theory upon which we hold that the appellee is entitled to recover is, that Ellsworth was ready and willing to perform his part of the contract, and was prevented from so doing by Pomeroy. The administrator of Pomeroy cannot take advantage of such wrongful acts. As we have seen the rule is, that where one party has been prevented by the opposite party from performing a contract, his remedy is the same as if he had performed. The parties agreed as to the cash value of the lands, and we think the court below did right in assuming that the lands would sell at their value. It is also argued by counsel for appellant, that Ellsworth might have sold such lands after the death of Pomeroy and compelled his devisees to specifically perform such contracts. This argument would have been entitled to weight and consideration, if we had not reached the conclusion that the death of Pomeroy had absolutely revoked the power of Ellsworth. When his authority was revoked, he had no right or power to do any act in the premises. His authority as agent was entirely gone, and the title to the lands was vested in his devisees without any authority on their part to carry into execution the contracts between their devisor and Ellsworth. Pomeroy might have devised such lands subject to the contracts with Ellsworth, and might have vested in his devisees full power and authority to carry out such contracts, but this he failed to do, and by his death the power of his agent was revoked. Under these circumstances, we do not think his personal representative can be

permitted to derive an advantage from the wrongful acts of Pomeroy.

Finally, it is strenuously contended by counsel for appellant that the claim of the appellee is exorbitant when compared with the services rendered by Ellsworth, and that it is so unconscionable that it should not be enforced by a court of equity. We do not think so.

The adventure was one in which Ellsworth took all the risk of loss, as Pomeroy was entitled to have from Ellsworth his money with ten per cent. interest, if the lands purchased did not produce it. This contract differs but slightly, except in the higher rate of interest, from the one passed upon in *Ellsworth* v. *Mace*, 33 Ind. 73, 78, in which it is said: " It is further urged, that to enforce this trust would be inequitable, inasmuch as the service rendered by Ellsworth was trifling. This is not a forcible consideration in the present case. It could have been pertinently replied that the return of the capital invested by Wheeler with accumulated interest at seven per cent. per annum, a profit for the use of money which was at the time condemned by our law in cases of loan as exorbitant and oppressive, ought to silence him or those who stood in his place when they attempt such an argument. The plain fact is, that one party furnished the money, and the other supplied the care and judgment to invest it profitably, with an agreement to give to Wheeler a fair compensation for the use of his capital, and one-half of the remainder of the property purchased besides, and to Ellsworth the other half. That the venture was immensely profitable must be deemed quite as much on account of the good judgment with which the lands were selected as because of the act of Wheeler in furnishing the capital. It was a fair business transaction, free from any taint of unconscionable advantage, and ought to be enforced."

We think there is no error in the record.

The judgment is affirmed, with costs.