## Richmond.

CAMPBELL v. RUST.

January 17th, 1889.

1. SPECIFIC PERFORMANCE—*Personal services.*—In general, courts of equity will entertain suits for specific performance of agreements relating to land, or to specific chattels having *pretium affectionis*, whenever law courts will not afford adequate remedy; but not of contracts for personal services, or acts involving skill, labor and judgment.

2. IDEM—*Damages—Adequate remedy.*—Equity will not ascertain and award damages in any case where specific performance or other equitable relief would be improper, or where there is adequate remedy at law.

3. IDEM—*Auxiliary relief—Writ of q. d.*—Where equity has jurisdiction of case proper for specific performance, it may, as auxiliary relief, decree compensation or damages; and where, in such case, damages are asserted, the court ought not to send the parties to litigate their rights in another forum, but should refer the amount to one of its masters, or direct an issue of *quantum damnificatus* to be tried at its bar.

4. EQUITABLE JURISDICTION AND RELIEF—*Case at bar.*—Complainant owned ore-bank, and agreed to deliver ore to company at certain price per ton, and made contract under seal with defendant, reciting that he leased to him the ore-bank on condition that he mine, prepare, and deliver to company certain quantity of ore per week, and for each ton, as shown by company's receipt, complainant was to receive two-sevenths and defendant five-sevenths of the price. The bill alleged that defendant failed to deliver the specified quantity, abandoned the ore-bank, and refused to perform his promises, and prayed for specific performance and payment of all sums due and to become due, under contract to complainant, and failing that, defendant be required to pay a sum sufficient to compensate complainant for all damages sustained, or to be sustained by reason of his failure;

HELD:

> Equity has no jurisdiction. The contract is not a lease of realty, but for personal acts and services, for the breach whereof there is adequate remedy at law.

5. IDEM—*Accounting—Case at bar.*—Where the accounts between plaintiff and defendant are complicated, and the duty of keeping them devolved under their agreement on defendant, there might be some ground for claiming jurisdiction in such a case. But not so where the agreement is silent as to such duty, and provides that company's weights be the guide, and that the company pay to the parties their respective parts.

6. CASES COMPARED.—*Nagle v. Newton,* 22 Gratt. 814, compared with and distinguished from case at bar.

Appeal from decree of circuit court of Page county, entered April 23d, 1887, in the chancery cause wherein B. C. Rust was complainant, and Walter Campbell and others were defendants.

It appears from the voluminous record that previous to November 14th, 1885, Rust had an arrangement to deliver to the Shenandoah Iron Company, at his siding on the Shenandoah Valley railroad, from his two banks, "the Amelia, or No. 1," and "the Strickler, or No. 2," iron ore at $1.75 per ton of 2,240 pounds, and that he had failed to realize profit at the business. On the 14th of November, 1885, he made with Campbell an agreement, under the seals of both parties, substantially to the effect "that Rust leases to Campbell his ore-bank, 'the Strickler, or No. 2,' for the period of seven months, with privilege to continue for two years, upon the terms that Campbell shall mine, prepare and deliver in merchantable condition, on the cars of the Shenandoah Valley railroad at Rust's siding, an average of one hundred and twenty tons of iron-ore per week, except during the months of December, 1885 and 1886, and January and February, 1886 and 1887, when he shall deliver sixty tons per week; and that for each ton Campbell shall receive $1.25 and Rust fifty cents from the company (by the Shenandoah Valley railroad receipts), provided, if there be an advance in iron-ore, it shall be divided equally between them; and that "Rust shall furnish Campbell, free of charge, steam engine and washer to wash said ore, and the buildings now used by said Rust for hands, horses, etc., and that Campbell shall have the exclusive control during the lease; and Campbell agrees to take immediate possession of said ore-bank, buildings, engine, washers,

etc., and in all respects comply with the agreement, and to keep the engine under cover, and return same and the washer in good condition, except natural wear from prudent use, and to deliver possession of the ore-bank, buildings, etc., to Rust at the end of the lease. And it is further agreed that after the earth covering the top of the ore has been removed, in raising the ore Campbell shall not be required to handle or remove more than four tons of earth and ore to produce one ton of iron-ore: or, in other words, every four tons of earth and ore raised shall produce one ton of iron ore; and should the bank fail to make such yield any time within twelve months, Campbell shall be at liberty to quit work and surrender possession to Rust."

Campbell took possession, as agreed, of ore-bank, buildings, engine and washer. The two last were the same used by Rust in his operations. Campbell did not ship any ore in November, being engaged in repairing the washer, building a dam, erecting buildings, etc., necessary to mining. Nor did he succeed in mining, washing and shipping the weekly average of iron-ore up to April 24th, 1886, when, telling Rust the bank could not be made to yield the weekly average, he abandoned the premises, of which Rust took possession.

Five days later Rust filed his bill against Campbell, the company and its receiver, J. W. Hoffman, and Wm. Milnes, Jr., setting forth the agreement and an alleged subsequent additional parol contract to the effect that all returns for ore shipped should be made to Campbell, and that he was to collect the money and pay Rust his share. The bill averred that Campbell received all the money and had paid Rust a part, but the latter did not know that it was all he was entitled to, as Campbell never would give him a statement; that Campbell had shipped later several hundred tons of ore, for which the receivers had not yet paid; that complainant had performed his stipulations, but that Campbell had failed and refused to perform his; and, specifying instances, alleged that Campbell had failed to make the first ore shipped merchantable, so that the company had docked the

price, and the reputation of the bank was injured; that Campbell had failed to wash the ore in a skilful manner, and thus had greatly impaired it; that he had failed to ship the weekly average of iron ore, though the bank, if properly worked, contains ore amply sufficient to have yielded at all times the said average, and one ton of iron-ore out of every four tons of earth and ore removed; and that by reason of these breaches the complainant, Rust, had sustained loss and damage, to-wit: $4,000. And the bill further charged that Campbell had suspended work at the bank, though still holding the lease, and the right to operate under it, to the exclusion of complainant, and would not perform his covenants, though the company was ready to receive and pay for the ore as formerly, which would force it to look out for other supplies, and deprive complainant of a near and ready market; that had Campbell complied with the agreement, he would have mined and shipped, up to April 24th, 1886, over sixteen hundred tons, upon which complainant would be entitled to over $800 from Campbell, and up to June 14th, 1886, the end of the seven months, over twenty-four hundred tons, upon which complainant would be entitled to over $1,200; that Campbell was insolvent, and would, unless restrained, collect the money held by the receivers, some $600 or $800, on which he had a lien as landlord, and that thereby he would sustain a loss, for which he had no remedy at law. The complainant further alleged that Campbell acted fraudulently in these transactions to the prejudice of complainant, particularly in fraudulently representing himself as solvent and able to work the ore bank actively and successfully, and in failing and refusing to comply with the terms of the lease, and in abandoning it without notice and without a proper test of the ore. And he prayed that the defendant answer the bill without oath; that he be enjoined from collecting and the receiver from paying him any money for iron-ore shipped by him from the ore-bank; that he be compelled *to perform specifically the agreement of* lease, and to pay complainant the money then due and the sev-

eral sums to become due him under said lease; and further, that if Campbell failed to pay him the money then due and to become due, he be decreed to pay complainant a sum sufficient to compensate him for all the injury and damage he had sustained, or might sustain by reason of Campbell's failure or refusal to perform specifically the agreement; that a master take an account of the ores mined and shipped by Campbell, the condition of each car-load, the money received by him, the amount paid by him to complainant, the quantity and value of the ore received by the company or its receivers from Campbell, the price whereof is unpaid, the amounts then due and to become due at the end of the seven months from the date of the agreement to complainant from Campbell, and the amount and nature of the damages sustained by the complainant by reason of Campbell's non-compliance with the agreement; that a receiver be appointed to collect all money due and unpaid by the company or its receivers, and to hold same till further order; and that all said damages be decreed to be paid by Campbell to complainant, and for general relief.

According to the prayer of the bill, an injunction was awarded and a receiver appointed.

The defendant demurred to and answered the bill. He admitted in his answer the execution of the agreement, the taking possession of the ore-bank, engine and washer as alleged and shipping no ore in November, because the time was employed in making necessary preparations; but denied the alleged subsequent parol contract. He insisted that according to a fair construction of the agreement, there was no stipulation for any average out-put of iron ore during the seven months, the arrangement for that period being made only to afford respondent an opportunity to ascertain if he could make such weekly average during the two years, if he should, after such experience, elect to continue the lease. He claims that complainant has failed to perform the agreement on his part as respects the washer; that the language of the instrument that "said Rust

was to furnish Campbell free of charge with engine and washer
to wash said ore," implied that Rust was to furnish him an en-
gine and washer having the capacity to wash and put in mer-
chantable condition said ore, at least to the extent of the weekly
average required, and charged that the engine and washer fur-
nished him would, though properly run to its full capacity,
wash not more than ten or eleven tons per day; that he had
repeatedly informed Rust of its deficiency, and that Rust prom-
ised to get another that would be equal to the work; but did
not.   He acknowledged he had not made the weekly average
contended for in the bill up to April 24th, 1886, when, upon
notice then given Rust, he abandoned the ore-bank in accord-
ance with the terms of the agreement, because the yield of four
tons of the earth and ore was not equal to one ton of iron-ore.
He contended also that this failure of yield was owing to no
fault of his own, but to the deficiency of ore in the bank, the
imperfection of the washer, and the cold and freezing of the
water used to wash the ore during much of the winter months;
and that the cost of mining and making merchantable the
yield (eleven tons per day) of the bank during the last week he
worked it, exceeded the value of the iron-ore by the sum of
$13.69 per day, after deducting the share of the complainant.
He also stated in his answer that he received but one payment,
and then the receiver, Hoffman, enclosed in an envelope directed
to respondent, a letter to Rust, with the vouchers for the ore,
and a draft payable to respondent for the price of the ore,
stating why he so drew the draft; that on the next day Rust
made the collection of the sum coming to him, and received the
same of respondent less the amount of a livery bill.   He ad-
mitted that a large quantity of iron-ore had been shipped to the
company for which no money had been received, but could not
state the quantity, having received no statement thereof from
the company, and that the sources of information were as open
to Rust as to himself.   He denied that he had abandoned the ore-
bank without notice to Rust, and without proper tests of the ore

in the bank to make the weekly average. He also denied the charge of removing buildings without complainant's consent, and the charges of insolvency and of fraud. He insists that the Shenandoah Valley railroad company's weights are specified in the agreement as the guide of the parties, and that there is nothing between them to take an account of; and in conclusion prayed that the injunction be dissolved, the order appointing a receiver set aside, and the bill dismissed.

The letters of Receiver Hoffman to Rust and to Berry, receiver, are filed with the answer and sustain the explanation of the one payment set forth therein.

The other defendants made no appearance. The complainant took the depositions of nineteen witnesses, and the defendant of twenty. Much of the depositions is irrelevant and a worthless encumbrance of the record. In the view taken of the case by the court, it is unnecessary to recite any considerable portion of the evidence. It will suffice to state that the complainant established that he had furnished Campbell with the same engine and washer used by himself at both banks; that he represented that this washer, when properly used and worked up to its capacity, would wash twenty tons a day according to the richness of the earth and ore put in it; and that it had sometimes done that when he used it; that in the judgment of many of his witnesses the earth and ore taken from the bank would yield forty or fifty per cent., and that there remained in the bank, when abandoned, a large quantity of iron-ore; that Campbell and most of his hands were inexperienced in mining and washing ore; that only four hundred and ninety-eight tons had been mined and shipped by Campbell up to the time of his abandonment of the bank; that the bank was unskillfully worked and was damaged at least $300. But the complainant utterly failed to prove the alleged subsequent parol contract.

On the other hand the defendant presented much evidence tending to prove that the washer, when furnished him, was very old, decayed, and out of order, and needing almost daily repairs,

and was incapable of washing an average of more than ten or twelve tons a day whilst he was operating it; that four tons of earth and ore did not yield one ton of merchantable ore, and that during the last week he worked the bank it required six tons of the earth and ore to yield one ton of iron-ore, and that the bank was practically exhausted; and that he had received but one payment and had paid Rust his share. But there would seem to be an almost irreconcilable conflict as to the capacity of both the ore-bank and the washer.

In September, 1886, the court having directed the master to take the account asked for in the bill, the same was taken and the report returned to April term, 1887, by which Campbell was charged with fifty cents a ton for two hundred and forty tons in November and December, 1885, each, and for two hundred and forty tons for January, February and March, 1886, each, for four hundred and eighty tons for April and May, 1886, each, and for two hundred and forty tons for June up to the 14th day thereof, 1886, making an aggregate of $1,200 for two thousand four hundred tons, and deducting for cash paid and a livery bill, leaving $1,127.58 as the balance due Rust from Campbell as of the 14th of June, 1886. The master also reported that Receiver Berry had received of the Shenandoah Iron Company's receiver, for ores shipped by Campbell, May 8th, 1886, $472.69, and July 6th, 1886, $92.85, aggregating $465.44, subject to the order of the court in the cause.

The cause came on to be finally heard April 23d, 1887, on the papers formerly read, the depositions, the exhibits, the demurrer, the motion to dismiss for want of equity, the master's report and exceptions thereto, and the court overruled the demurrer, the motion to dimiss and the exceptions to the report, and decreed that the report be confirmed and that the complainant recover of the defendant, Campbell, the sum of $1,127.58 with interest thereon from 14th June, 1886, and his costs, and the sum of $300 damages to which the complainant is shown by the evidence to be entitled, and that the receiver, Berry,

pay out of the funds in his hands the taxed costs of the complainant in this suit, the fees of attorneys, Newman and Parks, as evidenced by assignments of complainant to them, and the remainder to the complainant. But it is noteworthy that this decree does not provide that the amount decreed against the defendant, Campbell, should be credited by the amount of the funds in the hands of Receiver Berry, which the court directs him to pay out to and for the complainant.

From this decree the defendant, Walter Campbell, obtained an appeal to this court.

*Calvert & Henkel,* and *J. E. Shenk,* for appellant.

*J. G. Newman,* for appellee.

The only questions presented by the record are the following
First. Had a court of equity jurisdiction ?
Second. Did appellee (Rust) comply with his covenants ?
Third. Did appellant (Campbell) comply with his covenants ?
Fourth. Is the decree appealed from in conformity with the law and the evidence ?

(1.) Rust had a right to a specific performance of the deed of lease, and if Campbell refused to perform, or had disabled himself from performance of his covenants, Rust was entitled to damages to be assessed in equity. *Nagle* v. *Newton,* 22 Gratt. 814, 818, 819, 820, 821, etc. ; 2 Story's Eq. Juris. (ed. 1853), sec. 795–6, sec. 798, 799 ; *Clarke* v. *Curtis,* 11 Leigh, 585, 606, etc. See also 2 Story's Eq. Jur., secs. 711, 714–15, 719, 720, 721.

Had Rust failed to comply with his covenants, and Campbell had complied with his, he would have had the right to have sued Rust for specific performance. This was a mutual right, and the party complying with covenants had the right to sue the other for specific performance. *Clarke* v. *Curtis,* 11 Leigh, 585, 606–7.

As to the right to grant injunction and appoint receiver. 2 Story's Eq. Juris., secs. 826, 827 ; secs. 850, 851.

(2.) By said lease Campbell was to mine and ship ore from Rust's "ore-bank No. 2," and the fiduciary relations thereby created between Rust and Campbell required the latter to keep accounts of the number of tons of ore shipped, when shipped, and the condition in which it was shipped, and how much, if any, was rejected by the purchaser as unmerchantable, and the losses thereby sustained. It was also the duty of Campbell to keep an account of the average per cent. of clean iron-ore which the crude material of said bank yielded per week or per day, and especially of such yield during the *last week and last day* he worked said ore-bank. It was his duty to have furnished Rust with such accounts. *Vilwig* v. *B. & O. R. R. Co.*, 79 Va. 449, 453, 454–5–6, and cases cited; *Huff* v. *Thrash*, 75 Va. 546–7–8, etc.; *Walters* v. *Farmer's Bank of Va.*, 76 Va. 12, 18, 19, 20; *Tiller* v. *Cook*, 77 Va. 477, 479, 480; 19 Gratt. 62; 20 Gratt. 679–80; 33 Gratt. 455–6; 31 Gratt. 212, 217–18; 21 Gratt. 263, 269.

(3.) Rust and Campbell were tenants in common of the ore mined, and this gave equity jurisdiction. *Smith* v. *Tankersly,* 56 Am. Dec.; 75 Va. 546–7.

(4.) *The bill charges and specifies fraud.* Campbell in his answer positively denies having executed said deed of trust, or that there was any lien on his personal property. The *lien* having been proved by the production of the deed of trust, Campbell in his deposition attempts to explain his denial of the lien in his answer to the bill.

"Fraud indeed, in the sense of a court of equity, properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another. And courts of equity will not only interfere in cases of fraud to set aside acts done, but they will also, if acts by fraud have been prevented from being done by the parties, interfere, and treat the case exactly as if the acts had been done." 1 Story's Eq. Juris., sec. 187; Perry on Trusts, sec. 169.

It was fraud in Campbell to abandon the ore-bank without notice to Rust, and without having the yield of the ore-bank properly tested.

(5.) *The bill charges insolvency,* and the record shows that all of Campbell's property, real and personal, was, at the time of the institution of this suit, under deeds of trust, and that a judgment could not have been made out of him by execution at law.

(6.) The deed of lease was for the conversion of realty into personalty, the realty being of little value except for the mine or bank of iron ore, over which courts of equity will always take jurisdiction. *Anderson* v. *Harvey's Heirs,* 10 Gratt. 387, 398-9.

The counsel then proceeded to discuss the evidence, and concluded as follows:

The final decree is right. Campbell abandoned the ore bank on the 24th of April, 1886, and averred his determination to mine ore no longer. In his answer to the bill he denies the jurisdiction of a court of equity, and declares that he will not perform his covenants, and will not execute his part of the contract. His contract binds him to mine and ship a certain number of tons of merchantable ore in seven months, between the 14th day of November, 1885, and the 14th day of June, 1886. As soon as Campbell abandoned the ore-bank, on the 24th of April, and refused to mine ore, he became liable, under his contract, to pay Rust fifty cents per ton for all the ore he was bound to mine in seven months; and the fact that Campbell is charged interest on the sum found due by him from June 14th, 1886, instead of from April 24th, cannot be injustice or injury to him. He was liable to be sued on the 24th of April for specific performance of his contract; or, in case of his refusal to perform, to pay Rust fifty cents per ton for all the ore he was to mine in seven months. This proposition is too well settled even in text-books to need reference to authorities. The case of *Fisher* v. *Milliken,* 49 Amer. Dec. 495-7-9, 500, and note, decided that a

lessee of a mine was bound to pay for all the ore his contract bound him to mine, although he did not mine it. Rust never released Campbell from his covenant to mine ore.

RICHARDSON, J. (after stating the case), delivered the opinion of the court.

At the threshold we are met by the question which is raised by the demurrer and the motion to dismiss the bill at the hearing. The enquiry is whether or not this is actually a mere suit for damages under the guise of a suit based on undoubted equitable grounds. The bill prays that "Campbell be compelled to specifically perform the contract of lease and pay to the complainant the money now due him with interest, and to pay him the several sums of money which may hereafter become due under said contract of lease; * * * and that if Campbell fail to pay complainant the money now due or hereafter to become due him, when decreed to be paid, then he be decreed to pay him, in lieu of said sums, a sum of money sufficient to compensate him for all injury and damage he has sustained, or may sustain by reason of Campbell's failure or refusal to specifically perform said contract of lease; * * and that all damages sustained by the complainant by reason of Campbell's non-compliance with the terms of said lease, be decreed to be paid him." Then follows a prayer for an account of all such damages.

The above quotation from the bill at once discloses the nature of the case and serves to test its claims to be entertained by a court of equity. In the first place, the indenture set forth in the bill is not for a lease of the iron ore-bank therein mentioned, though it thus styles itself. It does not reserve a rent for the realty to its owner, but, on the contrary, it requires the return to be delivered to a stranger, the Shenandoah Iron Company. 2 Minor's Insts. 43. It stipulates that the appellant shall mine, cleanse and deliver an average of sixty or one hundred and

twenty tons of iron ore weekly to said company and not to the appellee, who was to collect his own *bonus* of fifty cents per ton from the company, or other purchaser of his ore. The alleged subsequent parol contract to the effect that Campbell should collect the entire price, $1.75 per ton, of the ore and pay appellee his share thereof, was not established by the evidence. The appellant, then, had no right to collect the appellee's portion, and was no more responsible therefor than the latter was for the former's portion. And the relation of landlord and tenant did not exist between those parties, and Rust had no lien on Campbell's portion, even though the ore had not been removed from the bank more than thirty days when the injunction was awarded and the receiver appointed.

Under the sealed agreement Campbell was an employee of Rust. Coke Litt. 142*b*; 2 Black Com. 41; *Lane* v. *Miller* 3 Gratt. 196; *Parrish's Case*, 81 Va. 1. Campbell's engagement was to mine and prepare for market so much iron ore weekly and to ship same to the company at Milnes, and to receive as his compensation for his personal services, skill and judgment in that behalf, five-sevenths of the price agreed on between Rust and the company, whilst Rust himself was to collect the remaining two-sevenths.

The appellee undertook, on his part, to furnish appellant an engine and washer to wash the ore which the latter was to mine and ship per week. Plainly enough this language meant *a washer adequate for this purpose.* If the washer furnished was inadequate to the required task, Rust himself was delinquent in the performance of his duty under the agreement. And again, Rust contracted that the ore bank should yield one ton of iron-ore from every four tons of earth and ore removed, and that if the ore-bank failed *at any time* to make such yield, then Campbell should be at liberty, if he so elected, to quit work and surrender possession to Rust.

These two questions, as to the sufficiency of the washer and the capacity of the ore-bank, were questions of fact, which

should have been determined before the final decree was entered. But as to these questions the master's report and the court's decree are both silent, and the evidence in the record is pointedly conflicting and unsatisfactory as the basis of a safe conclusion the one way or the other; so that the court below certainly erred in not directing the proper issue to ascertain the facts.

After over five months of diligent, but fruitless efforts (Campbell says), with the washer to prepare the weekly average for shipment, he, on the 24th of April, 1886, finding that the yield of the ore-bank for the week ending the day before was much less than one-fourth of the earth and ore removed and washed, notified Rust of his intention to quit work and surrender possession for said reasons; and did so. Five days later the bill was filed, the injunction awarded and the receiver appointed, all for the palpable purpose of recovering damages for Campbell's alleged non-compliance with his part of the agreement, and to prevent him from collecting his five-sevenths of the price of the iron-ore shipped by him from the ore bank and unpaid for, and to have the same kept for the benefit of Rust.

At this point, keeping in view the prayer of the bill, let us return to the question of jurisdiction. The appellee bases his claim to be entertained in a court of equity—first, upon the assumption that he was entitled to come into such court in order to compel a specific performance of what he calls " the deed of lease," and if Campbell refused, or disabled himself to perform, appellee had a right to damages to be assessed by the court.

It is true that it is the settled doctrine that when a court of chancery has jurisdiction of the case, and it is a case proper for specific performance, such court may, as ancillary to specific performance, decree compensation or damages; and where the ascertainment of damages is asserted in the case before it, the court ought not to send the parties to another forum to litigate their rights, but should refer the matter to one of its commissioners, or direct an issue *quantum damnificatus* to be tried at its own bar. *Nagle* v. *Newton*, 22 Gratt. 814.

In that case, Christian, J., pronouncing the opinion of the court, said: "There is an obvious distinction between cases where the party seeks relief in equity *as plaintiff*, and where compensation is sought by the defendant in resistance or modification of the plaintiff's claim. In the latter case the maxim prevails that he who asks equity must do equity."

And it is equally well settled that a chancery court will not ascertain and award damages in any case where specific performance or other equitable relief would be improper, or where there is an adequate remedy at law. · Yet it is the general rule that courts of chancery will entertain suits for specific performance of agreements whenever the law courts will not afford an adequate remedy, whether the agreements relate to land or to specific chattels having some special value to the owner above any pecuniary estimate. But they will not entertain a bill for the specific enforcement of contracts for personal services or acts involving skill, labor and judgment. 3 Pom. Eq. Jur., §§ 1343, 1344, and 1402, note; Adam's Eq. [81]. Tested by these principles, it seems that the appellee's case, as presented by the bill and the evidence, is not such a one as entitled him to come into a court of equity for specific performance, and that in point of actual fact his suit is a damage suit. For what else could he expect to receive even upon and after a performance of the appellant's covenants? Only money—fifty cents per ton for the iron-ore shipped from his bank to the iron company—for which *bonus* Campbell was liable neither originally nor as guarantor. The agreement was neither for a sale nor a lease of realty nor of specific chattels of peculiar value to the appellee, but was for personal acts or services involving the appellant's labor, skill, and judgment in mining and preparing iron ore for market, and the converting real estate into mere money—into fifty cents a ton for the ore shipped—the loss of which is always readily compensated by the receipt of damages, for the recovery of which the remedy at law is clear, adequate and ample.

The very language of the prayer of the bill on its face, in

effect, denies any demand for specific performance, and makes a demand for money—for sums of money due and to become due— *the specific performance sought.* We here repeat the language of the bill: "That Campbell may be compelled to *specifically perform the contract of lease, and to pay the complainant the money* now due him, with interest, and to pay him *the several sums of money* which may hereafter become due under said contract."

In *Nayle* v. *Newton, supra,* a case relied on by appellee to support the idea of equitable jurisdiction over his case, the plaintiff, Newton, filed his bill for the specific performance of his land sale to Nagle. The latter answered; did not object to performance, but claimed that he had been greatly injured by the failure of Newton to perform the covenants on his part, and by his intermeddling with and disturbing his peaceable possession and enjoyment of the land. The case was a proper one for specific performance, and the damages claimed by the defendant were in modification of the plaintiff's claim, and grew out of his failure to comply with the undertakings on his part; and hence, on appeal, this court held that the court below should have ascertained and awarded his damages.

The case at bar comes much more nearly within the ruling of this court in *Robertson* v. *Hogshead,* 3 Leigh, 373, in which a bill was filed by a vendee against the vendor, alleging fraud by the latter against the former in the original agreement, and praying that the agreement be rescinded for the fraud. In that case, Carr, J., pronouncing the opinion which denied the relief prayed for, said: "The bill, so far as it related to the main end of it (the rescission), was never sustainable; and taking away that ground, there could be no propriety in filing a bill in equity for the purpose of obtaining compensation in damages."

The bill here charges also that Campbell was guilty of fraud in falsely representing to Rust that he was solvent and able to fulfill his engagements, and likewise in abandoning the ore-bank without notice to Rust, and without having the yield of

ore properly tested. How, under the circumstances presented by the record, such representations can be construed as fraudulent, it is difficult to perceive, as it is not even alleged, much less proved, that he derived any advantage or benefit from them.

The same difficulty exists as to the alleged abandonment without notice and without proper tests of the ore. Neither could be treated as more culpable than ordinary breaches of covenants. But it suffices that the evidence fails to sustain either of the charges. And thus fraud, which is relied on as a ground of jurisdiction, also fails.

Yet another ground is set up. The bill prays for an account, and it is contended in argument that the fiduciary relations between the parties required Campbell to keep accounts of the number of tons of ore shipped; its condition; how much was rejected; the loss thereby; and that it was his duty to furnish Rust with such accounts; and that the necessity for them is a ground for equitable jurisdiction. If the accounts were complicated, and the duty of keeping them devolved upon Campbell under the agreement, there might be some force in this contention. But the agreement and the bill itself are silent as to any such duty resting upon Campbell. The former merely provides that Campbell should deliver the weekly average of merchantable ore at Rust's siding on the railroad, whose weights are expressly specified as the guide of the parties, and the iron company at Milnes was to pay to Rust himself his part of the price, and to Campbell his part. There is no pretence that there was any advance in the price of the ore. Rust had only to apply to the railroad agent at Milnes for statements and take them to the receivers of the iron company and get his money. There was no promise by Campbell to pay or deliver anything to Rust, and no guaranty of the company's payment to him. Hence there was obviously nothing between Campbell and Rust of which an account was necessary, except possibly an account of the damages for the alleged breach of covenants, as to which a jury was the appropriate tribunal.

The true doctrine on this subject is laid down in 1 Pomeroy's Eq. Jur., § 178, where it is said: "Even when the cause of action, based upon a legal right, does involve or present, or is connected with some particular feature or incident of the same kind as those over which the concurrent jurisdiction ordinarily extends, such as fraud, accounting, and the like, still, if the legal remedy by action and pecuniary judgment for debt or damages would be complete, sufficient and certain—that is, would do full justice to the litigant parties in the particular case—the concurrent jurisdiction of equity does not extend to such case. For example, whenever an action at law will furnish an adequate remedy, equity does not assume jurisdiction because an accounting is demanded or needed; nor because the case involves or arises from fraud," etc.

After full and careful examination, we come with some reluctance, but unhesitatingly, to the conclusion that the court below erred in refusing to dissolve the injunction and to set aside the order appointing a receiver, and also in overruling the demurrer to the bill and the motion to dismiss same at the hearing on the ground that a court of chancery was without jurisdiction to entertain the case. And as these views sufficiently dispose of the appeal, it is not necessary to pass upon other errors assigned. We are, therefore, of opinion to reverse and annul the decree appealed from, dissolve the injunction aforesaid, dismiss the bill and direct the receiver aforesaid to pay over to the parties, Campbell and Rust, the funds in his hands, in the ratio of five sevenths to Campbell and two-sevenths to Rust; and a decree to that effect will be entered here, but without prejudice to the right of the appellee, Rust, to sue at law if he shall be so advised.

DECREE REVERSED AND BILL DISMISSED.