# CHARLESTON.

## HOGG v. McGUFFIN.

### Decided May 3, 1910.

1. SPECIFIC PERFORMANCE—*Exchange of Stock—Inadequate Legal Remedy.*

   Equity will decree specific performance of a contract for exchange of shares of stock in corporations when legal remedy is not adequate because the stock sought is of special and peculiar value, or is not readily purchasable in the market, or has no certain ascertainable value, or a money judgment against the party would be worthless because of his insolvency, or other circumstance in the case calling for specific performance as the only adequate relief.

2. SAME—*Relief Awarded—Right to Lien.*

   If one is entitled to have specific performance of a contract for exchange of stock in corporations, and one of the parties transfer to an innocent purchaser the stock which he is to transfer in exchange, equity will give the other party to the contract a charge or lien upon the purchase money yet in the hands of such purchaser.

Appeal from Circuit Court, Mercer County.

Bill by Gory Hogg against R. M. McGuffin and others. Decree for defendants, and plaintiff appeals.

*Reversed and Remanded.*

67 W. Va.

*Hubard & Lee* and *A. W. Reynolds,* for appellant.

*H. A. Ritz, Sanders & Crockett, Dillon & Nuckolls,* and *S. L. Walker,* for appellees.

BRANNON, JUDGE:

A written contract was made between R. M. McGuffin and Gory Hogg by which McGuffin agreed to sell to Hogg 50 shares of the stock of the Pike Colleries Company at the par value of $100 each; and the contract provided that McGuffin would, at the expiration of two years from the date of contract, if Hogg should so request, sell and transfer to Hogg 50 shares of the stock of the Harvey Coal & Coke Company, in exchange for the stock of the Pike Collieries Company, which latter stock Hogg agreed to transfer to McGuffin in case of such exchange. Hogg paid McGuffin for the Pike Collieries stock $5,000 by check to him. Certificate of stock was issued to Hogg by the Pike Collieries Company. At the date of the contract McGuffin owned a large amount of stock in the Pike Collieries Company, and he owned 75 shares of stock in the Harvey Coal & Coke Company. The written contract declared on its face that the 50 shares of stock in the Harvey Coal & Coke Company sold by McGuffin to Hogg stood on the books of the Harvey Company in the name of McGuffin. Some time after this written contract a written contract was made between J. A. McGuffin, R. M. McGuffin, A. P. Gibson, S. C. Wilson and Gory Hogg, parties of the first part, and S. Dixon, of the second part, by which J. A. McGuffin, Gibson and Wilson sold Dixon certain shares in the Dunn Loop Coal Company and in the Prudence Coal Company and the Harvey Coal & Coke Company; and R. M. McGuffin sold Dixon 75 shares in the Harvey Coal & Coke Company and 30 shares in the Dunn Loop Coal Company and 200 shares in the Prudence Coal Company; and Gory Hogg sold Dixon 20 shares in the Prudence Coal Company. For the shares of stock sold to Dixon by R. M. McGuffin Dixon paid some cash and executed to McGuffin four notes payable in the future amounting to the sum of $89,950. The contract last mentioned provided that the stock sold to Dixon by the parties should be deposited with the notes as collateral security for the payment of the notes, and in pursuance of that clause

of the contract the said notes made by Dixon and the certifi-
cates of stock sold to him by the selling parties were deposited
in the hands of the Citizens National Bank of Charleston with
the understanding or upon the trust that the bank should receive
payment from Dixon of the notes and when paid deliver to him
the certificates of stock. Afterwards, within two years from the
date of the sale by McGuffin to Hogg of the Pike stock, Hogg
notified McGuffin of his desire to make the exchange of stock
provided for by the contract, and expressed his readiness to
transfer to McGuffin the Pike stock and demanded of McGuffin
that he transfer to Hogg the 50 shares of stock in the Harvey
Coal & Coke Company. McGuffin responded to this request and
demand that he had sold the Harvey stock to Dixon, and that
he could not make the exchange on that account, but offered
to repay Hogg the $5,000 which Hogg had paid him for the
Pike stock, with interest. Hogg declined such adjustment, and
he brought this suit against McGuffin making him and the
Citizens National Bank of Charleston and W. M. Williamson,
its cashier, defendants. The relief asked by the bill is that an
injunction be awarded restraining McGuffin from collecting any
money on the notes of Dixon, held by Williamson and the
bank, calling them trustees, or from making any transfer of
the notes, and that Williamson and the bank be enjoined from
disbursing or disposing of any money that might be paid on
the notes, and that the notes in the hands of Williamson and
the bank and the funds arising from them be attached and
garnished in the hands of such trustees, and applied as the
court might decree, and that the funds arising therefrom be
held intact to satisfy any decree in the case, and that the
contract between Hogg and McGuffin be specifically enforced,
in so far as possible, and that if the court should be unable to
compel performance of the contract between Hogg and McGuffin
by compelling a transfer of the 50 shares of stock of the Harvey
Company, McGuffin be required to pay Hogg the full market
value of the stock, and upon his failure to do so that the
amount be paid out of the funds arising from the said notes
in the hands of said trustees, and that the status of the parties
be preserved and complete determination of the questions in-
volved be made. I will further state that the plaintiff sued
out a writ of attachment against the estate of McGuffin basing

it upon the allegation that McGuffin had fraudulently incurred the liability for which the suit was brought. Williamson and the bank were designated as persons indebted to or having in their possession effects of R. M. McGuffin, and the attachment was served on them as garnishees. The result of the suit was that the attachment was quashed and the bill dismissed without relief. Gory Hogg appeals.

We think that the attachment was properly quashed, as the facts show no fraudulent incurrence of the liability. Surely there was no fraud in the contraction of the liability in the sale by McGuffin to Hogg of the Pike stock, and the affidavit does not say so; but was there any fraudulent incurrence of liability in the sale by McGuffin of his stock in the Harvey Company to Dixon? If McGuffin had secretly sold such stock, Hogg not knowing of it, there would be plausibility in charging that McGuffin thereby fraudulently incurred liability to Hogg because of such secret sale; but the fact is, that Hogg well knew of such sale, and we can by no means say that the sale was secret or fraudulent. But eliminate the attachment. The question then comes, Can Hogg support this suit in equity without the aid of that attachment? That attachment if good would fasten or clinch the fund in the bank's hands to answer the ultimate decree; but has Hogg other ground for fastening his claim upon that fund? We have concluded that he has. We cannot assert that legal title to the stock was in Hogg, but had he no right therein, as viewed in equity. We deem it firstly pertinent to inquire whether if McGuffin had not sold the Harvey stock to Dixon, Hogg could enforce the transfer by McGuffin to him of the said stock. As a general rule we admit that specific enforcement of a contract for the sale of corporate stock will not be made in a court of equity; but that is a general rule and is subject to exceptions. In the first place, this particular stock is identified. I note just here the fact that the contract by which McGuffin sold Hogg the Pike stock and promised exchange of it for Harvey stock recited on its face that the stock so sold was stock "which now stands on the books of said Harvey Coal & Coke Company in the name of the said party of the first part". That clause makes the contract single out the stock from all other stock. It identified it. We may say it separates it from all other stock, and enables any one to

put his finger upon it, because it stood in the name of Mc-Guffin on the stock book of the corporation, separated from the stock of every other stockholder and the certificate had its distinctive number. Hogg had an option to acquire it, and Mc-Guffin must keep the stock to answer that option. In the next place it is said that equity will not enforce such transfer where the remedy at law is adequate. Suppose a law suit by Hogg against McGuffin. In it in order to fix damages it would have to be made to appear, not only what was the value of the Harvey stock, but also the value of the Pike stock, and the difference between them would be the damages. But without detailing the evidence I can assert that it would be impossible to fix the value of the Pike stock. It was not on the stock market list. As McGuffin himself admits it had no fixed value. Not a syllable of evidence gives any value to it. The company became indebted and was thrown into the hands of a receiver and large debt judgments against it and McGuffin as its surety were rendered, and if that stock had any value whatever it would be far below par, practically worthless, and any value of it unascertainable. Whilst McGuffin says it would be worth something, what that something would be he does not pretend to say. If worth anything at all its worth is problematical, unascertainable. True, if entirely worthless, it would not be deducted from the value of the Harvey stock; but I say that its value could not be ascertained, which brings it under the rule spoken by many authorities. This would be an impediment to adequate remedy at law.

Again, the Harvey stock was not upon the stock list, and in that respect had no stock list value. It may be said that none was for sale, none could be purchased. The Harvey stock was very valuable. The company was very little indebted, the corporation a growing concern and earning a great deal of money, and paying fine and increasing dividends. Its stock had a peculiar value, worth three or four for one. "If it appears that corporate stock contracted for is desired for special and legitimate personal purpose, or that its market value cannot be fixed with certainty because the stock is not upon the market, it is manifest that a judgment in damages would be inadequate and impracticable, and specific performance may be granted." 22 Am. & Eng. Ency. L. (1 Ed.) 993. Fairly Hogg could say,

had the right to say, that he wanted this Harvey stock because of its present and promising prospective value. That is one consideration for specific performance.

Another consideration calling for specific performance is that this Harvey stock was a *close corporation.* Only a few stockholders held it. Not a case of great corporations like the great railroads or the U. S. Steel Corporation, with millions of dollars of stock on the stock list and purchasable in the open market. This Harvey stock could not be purchased in the open market, and the evidence shows it was not purchasable. What does the law say under this consideration? Cook on Corporations, section 338, says:. "Where the value of the stock is not easily ascertained or the stock is not to be obtained readily elsewhere specific performance will lie." We find in 26 Am. & Eng. Ency. L. 122, this statement: "Specific performance of a contract for the purchase or sale of stock will not be decreed where the stock is purchasable on the market, or has money value which may be readily. computed." "Specific performance will not be decreed if the shares are readily obtainable in the market." 6 Pomeroy Eq. Rem., section 752. But such is not the case with the Harvey stock. Taylor on Corporations, section 790, says: "Further, a contract for the sale of shares will be specifically enforced in equity, if it is not unconscionable or against public policy, when from the scarcity of the shares or other reasons the purchaser cannot go into the market and purchase similar ones. But if shares similar to those which are the subject of the sale, are readily purchasable in the market, equity will not, as a general rule, specifically enforce the contract; but will leave the parties to their remedies at law." In 1 Cook on Corporations, section 338, we find it stated that if the stock "is easily obtained in the market, and there are no particular reasons why the vendee should have the particular stock contracted for, he is left to his action for damages. But where the value of the stock is not easily ascertainable, or the stock is not to be obtained readily elsewhere, or there is some particular and reasonable cause for the vendee's requiring the stock contracted to be delivered, a court of equity will decree a specific performance and compel the vendor to deliver the stock." This law is well stated in *Safford* v. *Barber*, 70 Atl. R. 371. I refer for the same purpose to *Northern C. R.*

*Co.* v. *Walworth,* 74 Amer. St. R. 683. In *Manton* v. *Ray,*
49 Amer. St. R. 811, it is held that if the value of the stock
is uncertain and not easily ascertainable specific performance
will be decreed; but the "true standing of a corporation is
seldom known outside of its own officers. A stranger would,
in most cases, find it difficult, if not impossible, to prove the
real value of its stock, unless it is one that is rated for sale in
the market. He has no access to its books; he cannot know its
assets and liabilities; and although he is willing to take the
stock for a price he might be quite unable to prove that it
was worth that or any other price. No one can say that the
remedy of damages in such a case is an adequate remedy." I
cite the case of *Watkins* v. *Robertson,* 105 Va. 269, holding as
follows: "An option under seal for the sale of shares in a
joint stock company is a binding offer from which the promisor
cannot recede during the time stipulated for in the option, and,
if accepted during that time, constitutes a contract the specific
performance of which a court of equity will compel." Another
reason found for specific performance as stated in 22 Am. &
Eng. Ency. L. (1 Ed.) 992, is the insolvency of the defendant,
citing *Avery* v. *Ryan,* 74 Wis. 591, and *Clark* v. *Flint,* a
Massachusetts case found in 33 Am. Dec. 733, holding that,
"Remedy, by damages against one actually insolvent is not
adequate legal remedy such as will prevent a resort to equity."
The evidence practically shows McGuffin to be insolvent. He
is under thousands of dollars of liability by judgments and
executions against him as surety for the Pike Collieries Com-
pany. True, he gives evidence that he had a very considerable
amount of property; but the whole case shows that his solvency
is very problematical and doubtful. Now, is Hogg to be com-
pelled to take a mere personal judgment which would be sub-
ordinate to these prior liens? Equity ought not to say so. The
case is different from mere ordinary personal property, such as
horses or wheat, or other tangible property, because such prop-
erty can be readily bought, and one horse is as good as another
in this sense. How different with stock. Hogg had right to
the very stock in this valuable Harvey coal mine, a particularly
valuable one. But on this question of specific performance of
contracts for the sale of stock I need hardly have gone further
than to cite our own case of *Bumgardner* v. *Leavitt,* 35 W. Va.

194, where it was held that there might be specific performance in the case of stock in a steam boat company, a case similar to this. That case asserts that there may be specific performance under special circumstances.

If it be necessary to show, as I think it is, that if McGuffin yet owned the stock Hogg could compel him to transfer it, I think I have shown, by ample authority, that he could have done so. I assert the proposition that by the contract McGuffin agreed to keep that stock ready to answer Hogg's call for it. Hogg was entitled to demand the very stock itself. He had an option to buy it by exchange. When he elected to make that exchange and thus purchase the stock the option was converted into an actual contract and made Hogg's right a property right. But McGuffin sold the stock. What then? Hogg became entitled to the money proceeds. It is a trust fund. Hogg has a lien upon it, because we may regard it as money emanating from his property. Hogg may follow that fund. If not, what is his remedy? A mere decree for money against McGuffin and he insolvent. But aside from that consideration Hogg has right to follow that fund. He has no adequate remedy at law; but he is not driven to any remedy at law, doubtful or not, because he has a right to go for that fund independent of considerations of solvency or remedy at law. In *Barrett* v. *Mc-Allister,* 33 W. Va. on p. 759, where a party had an option for land and the optionor sold it the Court declared the right of the optionee to follow the purchase money and said: "This is entirely consistent with equity practice. On the execution of a contract of sale of real estate, the vendor becomes trustee for vendee, and, if he sells subsequently to a third party, the proceeds will be affected with the trust, and the vendee is entitled to require that they shall be paid over to him in lieu of the estate which had been placed beyond his reach." This Court said in *Ballard* v. *Ballard,* 25 W. Va. p. 477: "If, therefore, the vendor should again sell the estate of which he is such trustee he will be considered as selling it for the benefit of the vendee, and the second vendee if he has notice, or the conveyance to him is without valuble consideration will hold the estate subject to the first contract and be compelled to convey it to the first purchaser." "In contracts of sale upon the purchaser's option the question whether or not a conversion is effected at

all cannot, of course, be determined until the purchaser exercises his option; but the moment when he does exercise it, the conversion as between the parties claiming title under the vendor relates back to the time of the execution of the contract." 3 Pomeroy Eq. section 1163. The same principle is stated in Minor on Real Property, section 474. Section 1047, Pomeroy. Eq., says as follows: "By the well settled doctrines of equity a constructive trust arises whenever one party has obtained money which does not equitably belong to him and which he cannot in good conscience retain or withhold from another who is beneficially entitled to it; as for example when money has been paid by accident, mistake of fact or fraud, or has been acquired through a breach of trust or violation of fiduciary duty and the like. It is true the beneficial owner can often recover the money due to him by a legal action upon implied *assumpsit,* but in many instances a resort to the equitable jurisdiction is proper and even necessary." And the same book, section 1051, says: "As a necessary consequence of this doctrine, whenever property subject to a trust is wrongfully sold and transferred to a *bona fide* purchaser so that it is freed from the trust, the trust immediately attaches to the price or proceeds in the hands of the vendor, whether such price be a debt yet unpaid due from the purchaser or a different kind of property taken in exchange or even a sum of money paid the vendor, as long as the money can be identified and reached in his hands or under his control." Thus I repeat that that fund is a trust fund in the bank which Hogg may subject to his claim.

It is suggested that Hogg joined in the paper by which McGuffin and others sold stocks to Dixon and thus is estopped to make the claim sought to be asserted in this suit. Of course, that would estop Hogg as to Dixon from specific execution by transfer to Hogg of the stock, on the principle of estoppel that where a party stands by when he sees another buying property, and does not set up his claim and give warning to the purchaser, he is estopped from claiming to that purchaser's prejudice. For that reason Hogg cannot claim the Harvey stock, as also for the reason that Dixon is an innocent purchaser. But that has nothing to do with this case. Hogg's consent to the sale was no release of the obligation of McGuffin to him, no waiver of his right under another and different contract. He did not sign the

scratch of a pen or utter a word by which he released the contract between him and McGuffin or the obligation of McGuffin to him. We cannot take away from Hogg his vested property right without some action of his plainly so operating. It does not appear that Hogg knew at the time of the sale to Dixon that McGuffin was selling all his Harvey stock; he might have thought he had yet enough left to answer his demand.

But it occurred to me whether he should not have inquired whether McGuffin yet owned enough stock to answer his right to fifty shares. On further reflection I conclude that that is immaterial; for if even he knew that McGuffin was disposing of all of his stock, still that would not bar his claim, because he had the right to look to that fund for payment. He did not release his rights.

It is argued on the point put by *Jones* v. *Tunis,* 99 Va. 220, and Pomeroy's Eq., Vol. 6, section 837, that Hogg knew when he sued that McGuffin had sold the stock to Dixon, and could not have specific performance. We admit this as a general rule, but we do not decree specific performance, and ask, Does that principle repel Hogg from recourse to the fund coming from his property?

It is argued that the contract was not really a sale by McGuffin, but a subscription to stock, a contract with the Pike Collieries Company, and that the contract was only intended to indemnify Hogg to the extent of his outlay, a guaranty only for the Pike stock. That would deny the very word of the contract and the fact that McGuffin personally got the money for it.

It is argued that there was no consideration for this promise to exchange, and a want of mutuality forbidding the enforcement of the exchange. Obviously this cannot be so because Hogg paid McGuffin the large sum of $5,000, constituting a consideration not only for the Pike stock, but also for that covenant of the same contract providing that McGuffin would exchange Harvey stock for Pike stock.

And we ask how McGuffin can complain of our action when it only does that which he promised to do for large consideration.

These views conduct us to the reversal of the decree of the

circuit court of Mercer county, and having done this, this Court rendering such decree as the circuit court ought to have rendered, it is by this Court adjudged, ordered and decreed that R. M. McGuffin do pay to Gory Hogg the sum of $16,620 with interest from the 25th day of November, 1908, and the costs of said Hogg about his suit in the circuit court of Mercer county expended, and that said Hogg has right to have paid to him said sum and interest and costs; as also his costs in this Court expended, out of the four promissory notes made by S. Dixon to R. M. McGuffin, three of them for $25,125 each, and one of them for $14,575, all dated the 30th day of April, 1906, and in the record described, and that the moneys called for by those notes constitute a trust fund for payment of said sum and costs, and that Gory Hogg has a lien and charge upon said notes and the money called for by them for satisfaction of the same, and that the Citizens National Bank of Charleston may collect of said notes a sufficient sum to satisfy said sum and interest and costs, and out of such collection make payment of said sum, interest and costs to Gory Hogg, and such payment as it may make out of the collection of said notes shall stand valid to the credit of said bank and to the protection of said bank against any demand by R. M. McGuffin; and further that the said bank, if it collect said notes, shall and must pay out of its collection to Gory Hogg the said sum, interest and costs. It is further adjudged, ordered and decreed that R. M. McGuffin be enjoined and prohibited from collecting or transferring said notes, or in any wise disposing of them, or the money called for by them, unless and until he discharge to Hogg said sum, interest and costs, or until the same shall be discharged from collections made by said bank, and that said notes and the money called for by them remain intact in the hands of said bank as a trust fund to answer this decree. It is further adjudged, ordered and decreed that R. M. McGuffin has right, on such payment, to the 50 shares of stock in the capital stock of the Pike Collieries Company owned by Gory Hogg represented by the stock certificate issued by that company to Hogg on file in this case, and that when Hogg shall have been paid said money and costs, R. M. McGuffin may withdraw from the papers of this cause remaining in the circuit court of Mercer county, and hold as his own, the said stock certificate. And this cause is remanded

to the said circuit court for any further order found necessary to enforce and execute this decree.

*Reversed and Remanded.*