Oren Kelley *v.* Thompson Land Company *et al.*

(No. 7227)

Submitted April 27, 1932. Decided June 11, 1932.

`S. T. Spears,` for appellants.

*C. W. Maxwell* and *E. L. Maxwell,* for appellees.

HATCHER, PRESIDENT:

This appeal involves the character of several contracts entered into between the appellants and A. J. Thompson, deceased. The circuit court found that the contracts were personal and perished with the death of Thompson.

The cause was referred to a commissioner, and the facts as reported by him were approved by the court and are not questioned by counsel. Consequently we feel warranted in accepting the commissioner's statement of the facts, which is as follows:

### "QUESTIONS OF FACT

"Your commissioner finds that a verbal contract has been proven in this case by which A. J. Thompson in 1924 entered into an agreement with Oren Kelley, the plaintiff, to superintend the prospecting for coal on his tract of land hereinbefore described, to be employed for a period of five years if necessary, and if the result was satisfactory to said Thompson he, the said A. J. Thompson, would organize and incorporate a company to operate said coal, and said Thompson agreed to give to said Oren Kelley in addition to his salary of $125.00 per month a one-

eighth interest in the said corporation free of any expense to said Kelley; and in pursuance of this agreement the said Oren Kelley did superintend the prospecting of the said coal, having started upon the said work in the early part of the year of 1924, and located the Sewell vein of coal in the higher altitudes of said lands and caused to be made ten openings on the outcrop thereof at various places on all sides of said outcrop, and that the said A. J. Thompson in the early months of 1927 was satisfied with the said development as made and in way of carrying into effect his plans for the developing of said coal, as well as his promises with Oren Kelley, began the work of installing equipment for operating said vein of coal by arranging for building a bridge across Shavers Fork of Cheat River and by arranging to contract the grading and construction of a railroad from the Western Maryland Railway lines to a point where an incline plane and tipple would be erected for the dumping of the coal produced from said mine. He also arranged for the purchase of machinery to be used in the plant he was preparing to install for the operating of said coal, and had made considerable headway to that end at the time of his death in April, 1927.

"Your commissioner also finds that said contract was ratified in writing by the said A. J. Thompson as shown by the letters written by him and exhibited in this record.

"Your commissioner also finds that in consideration of the fact of said Oren Kelley reducing his salary for a period of time while superintending the prospecting of said coal, from $125.00 per month to $100.00 per month, said A. J. Thompson agreed to give to Elizabeth Kelley, wife of Oren Kelley, a one-eighth interest in the royalties in the said proposed coal operation on the said land; that the said Oren Kelley did reduce his salary for a period of time from $125.00 per month to $100.00 per month and that the said A. J. Thompson ratified this agrangement in writing as shown by certain letters exhibited in this record. * * *

"Your commissioner finds that C. H. Terry entered into a contract to perform the services of civil engineer for A. J. Thompson in the developing of the said coal operation for the salary of $200.00 per month and in addition thereto was to have a one-

eighth interest in the corporation for the developing of the said coal, and his capital stock should be held in escrow until he could pay for the capital stock covering the said one-eighth interest. No limit is specified as to this contract. This contract was ratified by writing as shown by letters exihibited in this record. He went to work on February 13, 1927 under said arrangement and continued to work up until the time of the death of A. J. Thompson on April 7, 1927 in the said capacity of civil engineer, and so far as this record shows did nothing to prevent him from having the full benefits of his contract with the said A. J. Thompson.

"This record also discloses that after the death of A. J. Thompson, his widow, Clara E. Thompson, R. J. Hopkins, and Eugene Mackey, as administratrix and administrators appointed in the state of Pennsylvania to administer the estate of said A. J. Thompson, deceased, went forward with the work of developing the said plant, cleared out a roadway for a railroad, made a railroad grade, constructed a bridge across Shavers Fork of Cheat River, laid some ties and rails, cleared a way for an incline plane and tipple and in fact continued working thereon until about October of 1927 when they ceased said operations.

"There is nothing in the record to show that said Thompson made a will. * * * There is no direct evidence in this record to show that all of the heirs and distributees of this estate consented for the said administratrix and administrators to go forward with this business. * * * The evidence discloses that mine openings were made at various points around the outcrop of 294 acres of land owned by A. J. Thompson and one opening was made on an adjoining tract of land on the east side of Shavers Mountain but at the outcrop of the same vein of coal. The evidence also discloses that the rock strata was uniform and that the mountain formation showed practically no breaks or evidences of breaks. There is evidence of a fault at one point but also evidence indicating that the fault was due to a slip of only a few acres of coal. * * * He (the commissioner) believes that the facts have been developed as well as the average prospector does before opening a coal operation, and he therefore holds that the said vein of coal has been sufficiently well prospected

to justify the finding that said vein of coal is of sufficient quantity and quality for an operation.''

Where the acts stipulated in an agreement require the exercise of special knowledge, genius, skill, taste, ability, experience, judgment, discretion, integrity or other personal qualifications of one or both parties the agreement is said to be of a personal nature. It seems to be an accepted rule that in contracts of this kind the death of one who was to perform a personal service shall dissolve the contract. Waterman on Spec. Perf. Contracts, sec. 87; Woerner, the Am. Law of Administration (3d Ed.), 1044-5; 6 R. C. L., subject, Contracts, sec. 372; Bishop on Contracts, sec. 600; 2 Elliott on Contracts, sec. 1453; Beach, Modern Law of Contracts, sec. 227; note 17 A. & E. Ann. Cases 182. If the undertaking of one of the parties to such a contract is not personal, his death does not affect it. This distinction is drawn very forcibly by Williston in his work on Contracts, sec. 1941, as follows: ''The assumption frequently made in the cases that because the contract of the employee is personal, that of the employer necessarily must be, seems wholly unfounded. There is no necessity logical or legal for both the promises in a bilateral contract to be personal in character because one is. The promise of a painter to paint a landscape is discharged by his physical inability to paint, but the death or illness of one who has contracted to buy the painting will not free his estate from liability. Similarly in contracts of employment the nature of the employer's undertaking should be considered in each case. If * * * no personal cooperation on his part is needed for the proper fulfillment of the contract, there seems to be no reason why his death should affect the continued obligation of the contract.'' Accord: Freeman's note 68 Am. Dec. 760.

The original undertaking of Kelley—to prospect for coal —was admittedly a personal service. That service was completed prior to Thompson's death and to his satisfaction. So all that concerns us now is whether the undertaking of Thompson, yet unperformed, was personal. The brief of appellants reiterates the challenge, ''What skill was required on the part of Thompson under these contracts?'' His part

of the agreement (uncompleted) was (a) to form a corporation, (b) to lease to that corporation certain coal lands, and (c) to turn over to the appellants certain proportions of the stock of the corporation and royalty from the lease, respectively. It is stated by some authorities that the test of whether a particular contract is discharged by death "is whether it is of such a character that it may be performed by the promisor's personal representative." R. C. L., *supra;* 13 C. J., subject Contracts, sec. 719. This test, however, is too narrow. An administrator acquires no interest in real estate and he could not perform a valid promise of his decedent relating to the disposition of land; but equity would enforce the promise against the decendent's estate. Bishop, *supra,* sec. 861; note 68 Am. Dec. 761; *Wylie* v. *Coxe,* 15 Howard (U. S.) 415; *Hawley* v. *Smith,* 45 Ind. 183; *Green* v. *Broyles,* (Tenn.) 39 Am. Dec. 156; *Bryson* v. *Mc-Shane,* 48 W. Va. 126, 35 S. E. 848. Specific performance of the promise has been made the test by some authorities. *Campbell* v. *Rust,* 85 Va. 653, 667; *Shepherd* v. *Goff,* 34 W. Va. 123, 125, 11 S. E. 997. Other cases have held that the intention of the parties should determine whether a contract was personal or impersonal. *Shultz* v. *Johnson,* 44 Ky. (Monroe) 497, 501; *Cox* v. *Martin,* 75 Miss. 229, 240; *Billing's Appeal,* 106 Pa. St. 558, 560.

It is likely that equity would enforce the delivery to appellants of the corporation stock contemplated in the several agreements with Thompson, as a mere ministerial matter. See *Hogg* v. *McGuffin,* 67 W. Va. 456, 68 S. E. 41; *Leach* v. *Fobes,* 11 Gray (Mass.) 506; Cook on Corporations (8th Ed.), sec. 338. Equity might require the heirs of Thompson to execute the contemplated lease, on the theory that the form of such a lease is practically standardized, and its preparation would require little, if any, personal care and judgment (the parties had agreed on the amount of royalty). But we have been cited no case, and an extended search has discovered none, where equity has ordered the performance of an agreement to form a corporation. The reason why there are no such cases is obvious. The formation of a going corporation is essentially a personal matter

requiring personal experience, ability, skill and judgment of the promoter. It was particularly a personal matter in this case. The record shows clearly that the parties relied wholly on Thompson to form and finance the intended corporation and upon his continued cooperation and supervision to make it a success. The consideration at the foundation of the contracts in question was distinctly personal. There is nothing whatever to indicate that a proxy or a "substitute service" for that of Thompson was ever thought of.

We therefore approve the ruling of the circuit court that the continued existence of Thompson was essential to the performance of his covenants and that appellants cannot recover on their special contracts.

The evidence does not support the contention that the several contracts were ratified by Thompson's heirs.

Appellants finally contend that they are entitled to a fair remuneration as upon a *quantum meruit,* for benefits conferred on the estate of Thompson. Recovery on this ground was not sought specifically in the pleadings, but is permissible under the prayer for general relief. It is settled law that "where an agreement is not illegal, but * * * unenforceable and one of the parties refuses to perform his promise after performance * * * by the other, the law will create a promise to pay for the benefits received. If a man * * * renders services for another under a contract which is * * * unenforceable, but not illegal he may recover on the quantum valebant or quantum meruit." Clark on Contracts (3rd Ed.) 650. See generally Williston, *supra,* sec. 1972; Story on Contracts, sec. 18; *Kimmins* v. *Oldham,* 27 W. Va. 258, 265; *Bell* v. *Kanawha Co.,* 83 W. Va. 640, 98 S. E. 885; *Wysong* v. *Board,* 86 W. Va. 57, 102 S. E. 753. The fact that Kelley discovered workable coal upon Thompson's land of sufficient area to satisfy Thompson that it could be mined successfully is *prima facie* evidence of benefit to the estate. If that benefit is of greater value than the wages in money Kelley received, he should be permitted to recover the excess value. A like ruling is made as to the services of Terry. There is no claim of beneficial service to the estate rendered by Mrs. Kelley. The circuit court directed

that Kelley be paid $25.00 a month for the period his salary was reduced. This was equitable and meets with our approval.

We accordingly modify the decree to the extent that Kelley and Terry may recover severally for benefits conferred on the estate not compensated for by their respective salaries, if any, and remand the cause for that purpose.

*Modified and remanded.*